[Cite as *In re J.B.*, 2013-Ohio-1705.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 98565**

---

## IN RE:    J.B.
## A Minor Child

## [Appeal by Mother R.B.]

---

## JUDGMENT:
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 09901437

**BEFORE:**   McCormack, J., Jones, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**   April 26, 2013

**ATTORNEYS FOR APPELLANT**

Anita Barthol Staley
7327 Center Street
Mentor, OH 44060

Judith M. Kowalski
333 Babbitt Road
Suite 323
Euclid, OH 44123


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Michelle A. Myers
Assistant County Prosecutor
C.C.D.C.F.S.
4261 Fulton Parkway
Cleveland, OH 44144


**GUARDIAN AD LITEM**

Michael B. Granito
24400 Highland Road
Suite 162
Richmond Hts., OH 44143

TIM McCORMACK, J.:

{¶1}  Appellant, R.B. ("appellant"), appeals the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, granting permanent custody of her daughter, J.B., to the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency").

{¶2}  As dictated by the statute, the controlling analysis in a permanent custody matter is the best interest of the child.  After a careful review of the record, we find that clear and convincing evidence supports the trial court's determination that granting permanent custody to the agency is in the best interest of J.B.  We affirm the trial court's decision.

{¶3} Our decision today directly and profoundly affects J.B.'s life.  The questions we are called upon to answer are, with whom and where will this bright little girl grow up?  What family setting is best for her?

{¶4}  J.B.'s mother, grandmother, great-grandmother, her foster parents, and especially her four-year-old cousin, with whom J.B. has lived nearly since birth, are each profoundly affected by our decision as well.

{¶5}  This determination, while ultimately made by this Court of Appeals, is the culmination of years of effort by family members, professionals, and J.B.'s foster family to humanely and accurately answer the question posed by the circumstances surrounding J.B.'s young life.  That question being, from this day forward, what family life, what home is in the best interest of J.B.?  What home will best provide for her safety, security,

her nurturing, shared affection, and hold the best prospect for her living up to her fullest potential?

{¶6} Many persons of good faith have worked diligently to shape our collective understanding of J.B.'s best interest. Both in the immediate and long term, it is vital to J.B.'s well being to be able to clearly understand how we reached this decision. J.B.'s biological and foster family members need to know as well our reasoning beyond the recitation of legal precedent. For all of the collective work on J.B.'s behalf to date, we need to be especially clear here in our determination, so that there be a life plan developed for J.B. and a process of healing can begin.

## Background

{¶7} In late 2008, Angelique C.'s ("Grandmother Angelique") two minor daughters gave birth several weeks apart. On October 9, 2008, her 13-year-old daughter, S.B., gave birth to a girl. Weeks later, on November 4, 2008, her 15-year-old daughter (appellant), also gave birth to a girl.

{¶8} An incident involving domestic violence occurred on January 29, 2009, which caused the removal of both appellant's and S.B.'s child.

{¶9} Four days later, on February 2, 2009, CCDCFS took emergency custody of both babies; appellant's baby was less than three months old, and S.B.'s baby was less than four months old.

**{¶10}** In August 2009, seven months after the agency took temporary custody of the babies, both babies were placed in the same foster home and have remained there since that time.

**{¶11}** This appeal concerns appellant's child, J.B., only. S.B.'s child, who has the same initials as J.B., is the subject of a companion case, *In re J.B.*, 8th Dist. No. 98546.

## Procedural History

**{¶12}** On June 16, 2009, the trial court found J.B. to be neglected and dependent. On September 13, 2009, the trial court committed her to the temporary custody of the agency.

**{¶13}** Subsequently, J.B.'s maternal great-grandmother, Sanetta C. ("Great-grandmother Sanetta"), filed a pro se motion for legal custody of J.B.

**{¶14}** On November 24, 2009, the agency filed a motion for an extension of temporary custody. On January 4, 2010, the trial court granted the extension. On June 7, 2010, the court reviewed the matter and determined appellant was still in need of case plan services.

**{¶15}** On July 20, 2010, CCDCFS filed a motion for permanent custody. Grandmother Angelique also filed a motion for legal custody.

**{¶16}** On September 8, 2010, the trial court reviewed the matter again and determined that although appellant was engaged in services, progress had not been made.

The court ordered the case plan to include Great-grandmother Sanetta and Grandmother Angelique.

{¶17} On September 23, 2010, J.B.'s foster parents moved to intervene in the case; the trial court denied the motion. This court affirmed the trial court's decision. *In re J.B.*, 8th Dist. No. 96652, 2011-Ohio-4830.

{¶18} On December 14, 2010, appellant filed for legal custody of J.B.

### GAL Report Prior to the Permanent Custody Trial

{¶19} Before the trial for permanent custody, the guardian ad litem ("GAL") for J.B. filed his report on November 1, 2011. He interviewed appellant, Grandmother Angelique, Great-grandmother Sanetta, the foster mother, and the agency's social worker. However, because of J.B.'s young age, the GAL determined that J.B. was not of sufficient age or maturity to express her wishes. He attended several supervised visits and last observed J.B. at the visit in October 2011. He had not attended any in-home visits.

{¶20} In the GAL's report, he noted the agency was critical of appellant because of her lack of commitment with the agency and her inconsistent record with regard to visitation. However, since the birth of her second child in 2011, she has been more open and cooperative with the GAL. He observed her in the apartment she shared with her older sister, which he found to be clean and appropriate for appellant and her second

child but inadequate for the addition of another child. He was told, however, that the social worker has yet to be able to get into that apartment on unscheduled visits.

{¶21} At the October 2011 visit, the GAL found that appellant showed more appropriate behavior with her children. He also had a chance to talk to appellant's older sister and was impressed with the older sister's parental skills.

{¶22} The GAL reported a great deal of animosity and resentment that had developed between Grandmother Angelique, the agency, and the foster parents. He reported that appellant followed her mother Angelique's advice closely. Meanwhile, Grandmother Angelique had not attended the visits consistently. The GAL expressed his concern about whether she would protect and nurture J.B. if she were given custody.

{¶23} Regarding Great-grandmother Sanetta, the GAL noted the agency had not considered her because she was convicted of a crime 28 years ago. The offense appeared to fall into the categories excluding agency placement. The GAL, however, questioned the agency's position, because she was subsequently considered to be suitable for custody of children of other family members. The GAL noted she attended all the visits and showed concern for J.B. He also found her residence to be appropriate.

{¶24} The GAL concluded that he was pleased with appellant's recent progress and that he was satisfied that her older sister would be available to assist appellant if needed. Accordingly, he recommended that J.B. be returned to the legal custody of appellant, with protective supervision by CCDCFS.

**{¶25}** In February 2012, the matter proceeded to trial on CCDCFS's permanent custody motion. The agency presented the testimony of two social workers who had been assigned to J.B.'s case and J.B.'s foster mother and foster father.

### The Social Workers' Testimony at the Trial

**{¶26}** Two agency social workers, Sarah Narine and Justin Fraley, testified at length at the trial. Narine worked on this case for over two and one-half years from January 2009 to September 2011. Fraley took over the case after September 2011. They testified about (1) the case plan for appellant, which included components for her schooling, her emotional stability, and her housing; (2) appellant's second child; (3) J.B.'s visits with the biological parents; (4) J.B.'s foster parents; (5) Grandmother Angelique; and (6) Great-grandmother Sanetta. We recount their testimony in the following.

**{¶27}** Narine testified that the agency created a case plan for appellant. The plan included education, counseling for her emotional stability, domestic violence, and parenting education. The agency's goal was reunification of appellant and her child. When appellant reached 18 years of age, the agency added a housing component to the case plan.

### A. Appellant's Schooling and Emotional Stability

**{¶28}** Appellant, 20 years old at the time of the permanent custody hearing, had trouble attending school regularly. She attended six different schools during the agency's involvement. She was unable to obtain a high school diploma or its equivalent.

**{¶29}** Regarding appellant's emotional stability, she was diagnosed with depression in the same year J.B. was born. She had problems controlling her anger. She would state she was stressed, and she had some outbursts. Narine testified that appellant's emotional stability was always a concern for the agency.

**{¶30}** As part of her case plan, the agency referred appellant for counseling for mental health stability and for dealing with her aggressive behavior in the community. She was resistant to counseling services in the first year, but she was eventually linked with a counselor in a local program to address those emotional issues. Her attendance, however, was not consistent. Despite the counseling services provided to her to control her anger, she was still involved in fighting incidents. Because of her inconsistent participation in the counseling services, the agency felt she had not achieved emotional stability. When her second child was born in April 2011, she reported feeling very overwhelmed.

**{¶31}** Because appellant was not consistent with her attendance or participation, the agency concluded that she did not meet the objectives of this part of her case plan.

### B. Parenting Classes

**{¶32}** Regarding the parenting component part of the case plan, appellant made more efforts. She was initially referred to DePaul School for Young Parents, which included school and parenting classes. She completed the parenting class there. Appellant also participated in a parenting class at Dasi-Ziyad Family Institute, but,

according to Narine's testimony, she took "a very long time" to complete the 16-week program. Appellant also reported to Narine she was participating in the Beech Brook parenting program, although she did not complete the program. Appellant did complete a "TAPS" parenting program, which she sought out herself.

## C. Visits

{¶33} Regarding visits with J.B., the visits took place weekly in an agency setting for two hours each. They were supervised. Appellant came to the visits regularly but was often very late. When J.B. was an infant, appellant would hold her, feed her, change her, and was attentive to her needs. As J.B. got older, appellant would play with her and engage her. J.B., however, had difficulties adjusting at the beginning of the visits. She would cry a lot and would try to leave. When she starting speaking, she would say, "I want to go home." After 15 or 20 minutes, she would then relax and interact with appellant and the other family members. The agency worked with appellant on easing these difficulties during the visits. Despite appellant's participation in the parenting classes, Narine found that during the visits with J.B., appellant "wasn't engaging and she wasn't bonding or involved with her child as much."

{¶34} Narine also observed appellant talking and texting on her phone during some of the visits, which prompted the social worker's request that she take an additional parenting course.

**{¶35}** The second social worker on the case since September 2011, Fraley, described how J.B. acted when he picked her up for the visits:

> Crying [the] whole time and wanting to go back. I would ask her specifically, you know, [J.B.], you are going to see mommy. No, no, no, I don't want to. I don't want to. She would cry until we got off of 490 at about 55th. So from Solon all the way she would cry and she would calm down eventually once the visit got going.

Once she got there, she interacted well with the family members.

**{¶36}** The agency started weekly in-home visits on December 17, 2011. Appellant was required to be present at pick-up and drop-off at a neutral location. The site was an RTA station. The foster father was responsible for transporting J.B. to the RTA station for these in-home visits. He would drop J.B. off but she would cling to him, not wanting to go. On the way back, she would appear "upbeat."

**{¶37}** At the fourth in-home visit, without informing the agency, appellant changed the location of the visit to her mother Angelique's home, a violation of the case plan, and appellant falsely told Fraley that there was a gas leak in their apartment. While at Grandmother Angelique's home, J.B. "didn't appear to be herself. * * * She was very quiet, very withdrawn, [and] she had very minimal interaction. * * * I [Fraley] observed her to be behaving differently."

**{¶38}** Because of the uncertainty of her housing situation, the agency amended the case plan to the in-home visit taking place in Great-grandmother Sanetta's house.

**{¶39}** On the day of Christmas Eve, an in-home visit was missed when appellant called the foster father to tell him a family member would be picking up J.B. from the neutral location (an RTA station) instead. The foster father was informed by Fraley that it was not permitted. No explanation was given as to why appellant could not come to the RTA station to pick up J.B. herself.

### D. Appellant's Second Child

**{¶40}** Appellant gave birth to another child, a boy, in April 2011. The agency initially took custody of the child, but the trial court returned custody to appellant a short time after removal. Appellant continued to parent her son without agency involvement. Narine visited appellant and her new baby in appellant's home. She had a crib for him, but Narine had to remind her to remove objects from the crib that may be harmful to him.

**{¶41}** Appellant told Narine that she was overwhelmed, although Narine observed appellant's care of her son to be appropriate. Narine believed that adding J.B. into appellant's life would have overwhelmed her more. Moreover, her relationship with her son was different from her relationship with J.B. — she had cared for him for a much longer time than she had J.B. In addition, her housing situation was not stable in that she went back and forth between her own home and her mother Angelique's home, and

sometimes her father's home. She lacked appropriate housing for two children and needed a dependable support system.

{¶42} When Fraley was asked why the agency determined appellant could take care of her second child but not J.B., he testified similarly to Narine, explaining that appellant had her son the entire time, whereas the bond was not there with J.B., based on his observation of her kicking and screaming and saying she doesn't want to see her mom. J.B.'s resistence did not change after several in-home visits.

## E. Housing

{¶43} Regarding appellant's housing, when she turned 18 in 2010, she was on a lease for a CMHA two-bedroom home with an older sister. She was, however, back and forth between the CMHA home and her mother Angelique's home, because she did not feel comfortable staying at the CMHA home by herself at times. Although appellant was on the lease on an apartment she shared with her older sister, she moved out at one point and was dishonest with the social worker about why she had moved out. At the time of trial, appellant was no longer on the lease on the shared apartment. Appellant's counsel, however, produced a letter indicating she had been assigned an apartment unit, pending completion of necessary paperwork.

## F. Appellant's Lack of Support and Encouragement from Family

{¶44} Narine described some degree of family support but believed the family support fell short for purposes of reunification. She believed they could have

encouraged and monitored appellant more and provided more emotional support. They should have shown her how to balance school and the social services, and helped her with transportation to various services and programs. At the meetings with the agency, which she would travel to on her own, the family members would remark that appellant's behaviors were "all on her own." Appellant had conveyed to Narine her wish that her family would be more supportive of her.

{¶45} Overall, Narine's testimony reflects that from the beginning, the agency's goal had been reunification with the family. Appellant though failed to achieve stability, either emotionally or in her environment. This despite some support from her family.

### G. The Foster Parents

{¶46} Fraley testified he observed J.B. in her foster family home every week. She has structure in the home where she had daily naps and snacks. She seems comfortable and bonded with both foster parents equally. The foster family had a newborn at the time of the trial, and J.B. called him her brother. Fraley also described J.B.'s relation with her cousin as very strong.

{¶47} Fraley described the relationship between appellant and J.B. as a "slight bond," while testifying to J.B.'s attachment to her foster parents. The trial court asked if Fraley had ever spoken to J.B. regarding her placement. Fraley testified that J.B. "consistently expresses that she wants to stay with [foster mother] * * *. When I ask her

and try to encourage her about going to see her mother * * *[,] [s]he says, No, I want to go back to [foster mother's] house * * *."

### H. Grandmother Angelique

{¶48} The agency considered placement of J.B. with Grandmother Angelique. The agency eventually disapproved it. Grandmother Angelique herself had a lengthy history with the agency. She had an "open case" with the agency in 2005 or 2006. When the agency explored Grandmother Angelique's interest in having J.B. placed with her, she indicated she was overwhelmed with her own children. In addition to appellant and S.B., she has three younger children. It would be very difficult to provide and care for an additional child. According to Narine's testimony, even after Grandmother Angelique filed for legal custody in July 2010, she was still stating to the agency that she was overwhelmed, that "it's too much," that she has her kids to take care of, and that "she has her own life to live." There were inconsistent statements made by her at that time as to whether she was or was not overwhelmed. The agency was aware of one incident where one of her children was left in a store.

{¶49} As to Grandmother Angelique's visits with J.B. and her cousin, Narine testified the following:

> There has [sic] been times where she [Grandmother Angelique] has gotten angry and if it was at me, then I will leave. But it's been in front of the girls and it scared them, that happened. There are times that she is appropriate. She will play with them, she will bring them snacks, but then there are those times that there is some inappropriate behaviors [with other family members present at the visits], yes.

{¶50} Grandmother Angelique initially attended the visits consistently. Her attendance later became very inconsistent. She did cooperate with the agency and made efforts to get appellant enrolled in the Life Skills Program. She also tried to get her to attend GED classes. In fact, Grandmother Angelique tried to enroll in school herself. She also cooperated with the agency and assisted in appellant's getting help to address her mental health issues.

{¶51} The agency also asked Grandmother Angelique, appellant's father, and Great-grandmother Sanetta to attend a parenting program, which they completed.

{¶52} Narine acknowledged that there was animosity from Grandmother Angelique toward Narine and their relationship was strained after the agency filed for permanent custody.

{¶53} The agency also considered appellant's father for placement of J.B. They subsequently denied it because he was not employed, lived with his own mother in a two-bedroom apartment, where another child also resided. He was not very involved with the case. He rarely attended meetings or visits. The agency was concerned with his ability to control appellant's decision-making regarding J.B. J.B. knows Angelique is her grandmother. Appellant's father would attend visitation only now and then.

## I. Great-grandmother Sanetta

{¶54} In addition, the agency considered Great-grandmother Sanetta for a potential placement. Great-grandmother Sanetta was not forthcoming with the agency regarding her criminal history. The agency learned that she had been convicted of gross sexual imposition, for which she served five years in prison. In addition, Narine testified that great-grandmother's health was also a concern for the agency, although Narine did not elaborate on her health issues.

{¶55} The agency was aware that, despite her conviction, she was given custody of a nephew and a niece in 1992, and subsequently, she was also appointed the caregiver of another niece. She raised all three to adulthood. The agency had received complaints regarding these children, which were either unsubstantiated or referred for various services. She lived in Texas but was in the process of moving back to Cleveland to help her daughter Angelique with Angelique's children. She had been previously in touch with the agency due to appellant's own juvenile court proceedings. When J.B. was taken into custody in January 2009, the agency contacted Great-grandmother Sanetta, and she indicated her interest in having J.B. placed with her. Narine testified great-grandmother has not wavered in her commitment to care for J.B.

{¶56} Great-grandmother Sanetta attended the visits with J.B. consistently and conducted herself appropriately. J.B. called Great-grandmother Sanetta her "big grandma."

## Foster Mother's Testimony

**{¶57}** Both foster parents testified at trial. The foster mother testified that J.B. was placed into her home in August 2009. The agency told her and her husband that the goal was reunification. Because J.B., by that time, had already been in the agency's custody for eight months, she was on a fast-track reunification. They were told the placement would be six months.

**{¶58}** Because the goal of the case was reunification, both foster parents worked with appellant to pursue the goal of reunification. In 2010, they took it upon themselves to reach out to appellant and her family. They tried to include appellant in J.B.'s life. They took appellant and J.B. to the zoo and went to Chuck E. Cheese together for J.B.'s second birthday party. The foster mother also took appellant and J.B. to a clinic for a test to establish paternity. The foster parents invited appellant to other activities, but she did not attend. Because Grandmother Angelique felt J.B. and J.B.'s cousin should meet with Great-grandmother Sanetta, the foster mother and Grandmother Angelique coordinated a visit with her. The foster mother took pictures of the family and mailed the pictures to them. Appellant did not attend this event, however. The foster mother and her husband also organized a Labor Day picnic for appellant's family. Appellant did not attend this event. She also invited appellant to go to the Cleveland Public Library for a story time activity. Appellant did not attend this event either. According to the foster mother, appellant did not seem interested in seeing J.B. When the foster mother took J.B. for her

regular dental and medical checkups, the agency would inform appellant of these appointments and invite her to participate. She did not attend them. Great-grandmother Sanetta tried to come to a dental appointment, but she got lost.

**{¶59}** To help J.B. know her biological family, the foster mother took many photographs of J.B.'s family and posted them in her room. J.B. knows who her mother is and on one occasion said, "I love my mommy R* * *."

**{¶60}** Appellant improved in 2011. The foster mother would see appellant frequently at the supervised visits at the agency when she dropped off J.B. for the visits. They had an amicable relationship. Because J.B. had difficulties with transition, she would stay a little longer and encourage J.B. before leaving. Great-grandmother Sanetta attended these visits most consistently. Appellant typically arrived late.

**{¶61}** The foster mother described J.B. as very smart and articulate. J.B. asked a lot of questions about the visits. When the visits progressed to in-home visits on Saturdays, she had to spend a lot of time with J.B., preparing her for the visits on Friday nights. The preparations were difficult because J.B. had many questions. She would say: " Can you come with me?"; "Why do I have to go?"; "Will you pick me up early?"; "Can you stay with me?"; "Can [foster father] come too?" She would also ask if her cousin had to go too. On Saturday morning, it would be chaos trying to get her out the door and into the car. J.B. would literally "flee from the scene" by running from the

front door down the hallway to get away from them and refusing to put on her coats and shoes.

{¶62} The foster mother would talk to J.B. about these visits, trying to encourage her. J.B. would mention a few things she did in appellant's home, and would say "I don't want to go." After the in-home visits began, both foster mother and J.B.'s teacher at the day care, which J.B. attended twice a week, noticed that J.B. started to chew her fingers. Also, she became very reluctant to go to the weekly supervised visits on Wednesday nights. During a trip to the visitation, she said, "I want to jump out of the car right now," which worried the foster mother. She would be "verbally and physically upset, crying, screaming" when she was dropped off for the weekly visits.

{¶63} The foster mother stated that she has a great relationship with J.B. She described her as a "wonderful, brilliant" child. J.B. is very bonded to both foster parents. The foster mother gave birth to a baby boy in November 2011. J.B. loved the baby. She would kiss and hug the baby before she left the house and before she went to bed.

{¶64} Regarding J.B.'s cousin, the two girls have been raised together their entire life, now almost four and one-half years, and had been together in the foster family for two and one-half-years at the time of the custody trial. The foster mother described them as "more than sisters" and "more than twins."

{¶65} The foster mother testified that J.B. is bonded to her and her husband's extended family as well. J.B. calls the foster mother's mother-in-law "Nana" and her

father-in-law "Pop." They watch J.B. and her cousin two days a week. The girls spent the night at their house when the foster mother had her baby. The girls are also very bonded with the foster mother's mother, her father, and her 17-year-old sister. The foster mother's mother, whom J.B. calls "Grammy," would come to their home to help out and was a major help with raising J.B.

{¶66} The foster mother stated that around September 2010, the reunification plan came to a halt and the agency was considering a filing of permanent custody. She and her husband then offered to take legal custody of J.B. as an alternative to permanent custody. Great-grandmother Sanetta "gave her blessings." The foster mother was aware Grandmother Angelique and Great-grandmother Sanetta had also filed for legal custody but understood that the agency did not approve them.

## Foster Father's Testimony

**{¶67}** The foster father testified that he and his wife transported J.B. for the visits. When the agency added Saturday home visits in December 2011, he was the one dropping off and picking up J.B. for these visits. J.B. appeared to be anxious the night before these visits, asking "Who's dropping me off? Who's picking me up? Are you picking me up?" over and over again. On the morning of the visits, it would be very difficult to get her out of the house. During the trip to the drop-off location, a rapid station, she would "lock up" — stop talking to him. Once they got there, when appellant arrived, J.B. would start acting out and crying, saying, "Do I have to go[?] Is my cousin going to be there? Are you picking me up? Can you come with me?" When appellant took J.B., J.B. would cry and say "Can you just walk with me to the bus station?" After the visit, she would be very quiet in the evening.

## GAL's Testimony

**{¶68}** The guardian ad litem (GAL), Michael Granito, who had prepared a report, summarized his report. He recommended that J.B. be reunited with appellant. He commended the foster family for having done a good job raising J.B., but he found appellant to have matured over the course of the case and to have the ability to take care of two children. The GAL admitted he had not observed the child in the foster family's home since 2009 and had not observed the in-home visits. He felt that there would need to be a transition period and J.B. would need time to bond with appellant. The GAL's

testimony focused on appellant's maturity and ability to parent, but he offered little about the best interest of J.B.

**{¶69}** There was no testimony from Grandmother Angelique or Great-grandmother Sanetta

**{¶70}** On June 4, 2012, the trial court issued its decision committing J.B. to the permanent custody of CCDCFS and denying all motions for legal custody.

**{¶71}** Appellant filed a timely notice of appeal. Both Grandmother Angelique and Great-grandmother Sanetta also appealed the trial court's decision. *See In re J.B.*, 8th Dist. Nos. 98566 and 98567 (Grandmother Angelique's appeal), and *In re J.B.*, 8th Dist. Nos. 98518 and 98519 (Great-grandmother Sanetta's appeal).

## Appeal

**{¶72}** On appeal, appellant raises one assignment of error for our review:

The trial court erred in granting the motion for permanent custody as such decision was against the manifest weight of the evidence and resulted in a manifest miscarriage of justice.

**{¶73}** Under her sole assignment of error, appellant argues that the trial court's decision to grant permanent custody of J.B. to CCDCFS was not supported by the evidence.

**{¶74}** We begin with the recognition that "a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997).

"The permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case." *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. "All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). This court has emphasized that the "termination of the rights of a birth parent is an alternative of last resort." *In re Gill*, 8th Dist. No. 79640, 2002-Ohio-3242, ¶ 21. "The purpose of the termination of parental rights statutes is to facilitate adoption and to make a more stable life for dependent children." *In re Howard*, 5th Dist. No. 85 A10-077, 1986 Ohio App. LEXIS 7860, *5 (Aug. 1, 1986).

### The Two-Prong Permanent Custody Analysis

**{¶75}** R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). It authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the four factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child

placing agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(a)-(d).

**{¶76}** If any of these factors exists, the trial court proceeds to analyze whether, by clear and convincing evidence, it is in the best interests of the child to grant permanent custody to the agency.

### First Prong:   R.C. 2151.414(B)(1) Factors

**{¶77}** R.C. 2151.414(B)(1) contains four factors.  When the child is neither abandoned nor orphaned, the court considers the possibility of reunification ("whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents"), or whether the child has been in an agency's temporary custody for 12 out of 22 consecutive months.

**{¶78}**  Regarding the reunification factor, R.C. 2151.414(E) enumerates 16 factors for the trial court to consider as to whether the child should be placed with either parent.  These factors include, among others, whether the parent failed to substantially remedy the conditions causing the removal of the child, despite reasonable case planning and diligent efforts by the agency, and whether the parent demonstrated a lack of commitment.

**{¶79}** The 12-of-22-consecutive-months provision affords parents 12 months to work toward reunification and the provision "balance the importance of reuniting a child

with the child's parents against the importance of a speedy resolution of the custody of a child." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21.

{¶80} Only one of the four factors must be present for the first prong of the permanent custody analysis to be satisfied.

### Second Prong: Best Interest of the Child Analysis

{¶81} Once the juvenile court ascertains that one of the four factors listed in R.C. 2151.414(B)(1) is present, then the court proceeds to an analysis of the child's best interest.

{¶82} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

## Standard of Review

**{¶83}** R.C. 2151.414 requires the court to find, by clear and convincing evidence, (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(d), and (2) an award of permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "'a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), at paragraph three of the syllabus. While requiring a greater standard of proof than a preponderance of the evidence, clear and convincing evidence requires less than proof beyond a reasonable doubt. *In re Parsons*, 9th Dist. Nos. 97CA006662 and 97CA006663, 1997 Ohio App. LEXIS 5141 (Nov. 12, 1997).

**{¶84}** As for our own role on appeal from the trial court's decision, we are reminded a juvenile court's termination of parental rights and an award of permanent custody to an agency is not to be reversed unless the judgment is not supported by clear and convincing evidence. *In re: Dylan C.*, 121 Ohio App.3d 115, 121, 699 N.E.2d 107 (6th Dist.1997).

## The Trial Court's Findings Regarding the First Prong

{¶85} Regarding the first prong, CCDCFS established, and the trial court found, that one of the four R.C. 2151.414(B)(1) factors existed — the child has been "in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *."

{¶86} This finding is supported by the record. Pursuant to R.C. 2151.414(B)(1), for the purposes of this section, a child is deemed to have entered the temporary custody of an agency on the earlier date of the date the child is adjudicated as neglected or dependent, or the date that is 60 days after the removal of the child from home.

{¶87} In this case, the agency removed J.B. from the home on January 29, 2009; thus, the date that is 60 days after the removal is March 29, 2009. The date the child was adjudicated as neglected and dependant is on June 16, 2009. The earlier date of these two is March 29, 2009. The agency filed its motion for permanent custody on July 10, 2010. Therefore, under R.C. 2151.414(B)(1), J.B. is deemed to be in the temporary custody of CCDCFS for over 12 months, 15 months to be exact.

{¶88} Because one of the four R.C. 2151.414(B)(1) factors existed, the factor set forth in R.C. 2151.414(B)(1)(a) — the possibility of placement with either parent within a reasonable time — is not determinative in this case. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21; *see also In re D.A.*, 8th Dist. No. 95188, 2010-Ohio-5618, ¶ 44. "The court does not need to determine that the child cannot or should not be placed with either parent within a reasonable time [when] the child has

been in the temporary custody of one or more public children services agencies for more than 12 of the last 22 months." *In re M.H.*, 8th Dist. No. 80620, 2002-Ohio-2968, ¶ 25; *see* R.C. 2151.414(B); *see also In re William S.*, 75 Ohio St.3d 95, 99, 1996-Ohio-182, 661 N.E.2d 738.

{¶89} Although the trial court did not have to engage in an R.C. 2151.414(B)(1)(a) analysis, i.e., the possibility of placement with either parent within a reasonable time, the trial court did engage in such an analysis, applying several pertinent factors enumerated in R.C. 2151.414(E), which, as we stated above, including whether the parent failed to substantially remedy the conditions causing the removal of the child, despite reasonable case planning and diligent efforts by the agency.

{¶90} Applying the R.C. 2151.414(E) factors, the trial court found that following the placement of J.B. outside of her home, and despite reasonable case planning and diligent efforts by CCDCFS to assist appellant to remedy the problems that initially caused J.B. to be placed outside the home, appellant failed to remedy the conditions that caused the removal. The trial court found that relevant services were provided, but appellant did not meet the objectives of her case plan that was designed to reunite J.B. with appellant.

{¶91} The trial court did recognize that appellant was now no longer a minor, and had made significant progress in the parenting part of the case plan and visitation with J.B. However, the court found that appellant had only made some progress in dealing

with domestic violence and emotional stability issues. Further, the court found that she had made insufficient progress in the areas of schooling and obtaining her own housing.

{¶92} Our own review of the trial testimony shows that during the course of the case, appellant had been through six different schools and did not attend school on a regular basis. Although appellant at one point enrolled in GED classes and attended life skills classes, she did not complete her education and remained at a 10th or 11th grade level as of September 2011. Appellant was initially resistant to engaging in services to address her mental health needs, including depression and anger issues. Despite the counseling services provided to address her anger, and despite her attendance in counseling services through Murtis Taylor, there were still reports of her fighting in the community. Thus, the social workers deemed her emotional stability not to have been established.

{¶93} After appellant reached the age of majority, the case plan was amended to include a housing component. There was evidence that appellant had been residing in a home with her sister, and appellant was named on the lease for a time. However, appellant was continually back and forth between both her mother Angelique's home and her father's home, due to her conflicts with family members. Although there was evidence indicating that appellant had recently applied for housing, consistency of the housing component of the case plan had not been established.

**{¶94}** The record reflects appellant made progress on the parenting component of the case plan. She completed the parenting class in DePaul School. However, it took her a very long time to eventually complete another 16-week parenting program. Even if the parental-classes part of the case plan is deemed completed, as this court has previously recognized, successful completion of a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a social services agency. *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.).

**{¶95}** Therefore, although the trial court need not make the R.C. 2151.414(B)(1)(a) finding in this case, it did. And, based on the trial testimony, we find that there was clear and convincing evidence to support the court's determination that J.B. cannot be placed with appellant within a reasonable time, because, despite reasonable case planning and diligent efforts by the agency, appellant failed to remedy the conditions that caused J.B.'s removal.

**{¶96}** Appellant argues on appeal that the agency did not show that it made reasonable efforts to reunify J.B. with her and the trial court erred in finding that it had.

**{¶97}** We note that R.C. 2151.419(A)(1), which relates to the agency's obligations to show that it made reasonable efforts to prevent removal or to return the child home, applies only to hearings held pursuant to R.C. 2151.28 (adjudicatory hearings), division (E) of R.C. 2151.31 (ex parte emergency orders for custody), R.C. 2151.314 (detention or

shelter care), R.C. 2151.33 (temporary care or emergency medical treatment), or R.C. 2151.353 (disposition of abused, neglected, or dependent child. *See In re C.N.*, 8th Dist. No. 81813, 2003-Ohio-2048.

**{¶98}** In this case, the motion before the trial court was one for permanent custody under R.C. 2151.413; therefore, a reasonable efforts determination generally is not required. *In re La.B.*, 8th Dist. No. 81981, 2003-Ohio-6852; *In re Z.T.*, 8th Dist. No. 88009, 2007-Ohio-827, ¶ 49. While R.C. 2151.419(A)(1) does not apply to a motion for permanent custody brought pursuant to R.C. 2151.413, "the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights" and if reasonable efforts have not been demonstrated prior to the hearing on permanent custody, the agency "must demonstrate such efforts at that time." *In re: C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 43. Here, the trial court found the agency provided a reasonable case plan and made diligent efforts. After a review of the full record, we find the evidence supports the trial court's finding.

## The Trial Court's Findings Regarding the Second Prong (Best Interest of the Child)

**{¶99}** R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that a court should consider in determining the best interest of the child. The satisfaction of one of these enumerated factors permits an award of permanent custody. *In re D.A.*, 8th Dist. No. 95188, 2010-Ohio-5618, at ¶ 46; *In re Moore*, 8th Dist. No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000), citing *In re Shaeffer Children*, 85 Ohio App.3d 683, 621 N.E.2d 426 (3rd Dist.1993). In addition, this court has expressed the view that the discretion that a trial court has in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *In re L.C.*, 8th Dist. No. 93657, 2010-Ohio-778, ¶ 16, citing *In re Satterwhite*, 8th Dist. No. 77071, 2001-Ohio-4137.

**{¶100}** Here, the trial court found by clear and convincing evidence that granting of permanent custody to be in J.B.'s best interest, upon considering the following: (1) the interaction and interrelationship of the child with her parents, siblings, relatives, and foster parents; (2) the custodial history of the child; and (3) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody.

**{¶101}** Our own review of the record reflects that the requisite statutory considerations were made and that the trial court's determination was supported by clear and convincing evidence.

{¶102} As an initial matter, we point out that the trial court recognized the GAL recommended a denial of a granting of permanent custody. The trial court nonetheless determined that clear and convincing evidence supports a grant of permanent custody to CCDCFS to be in the best interest of J.B. We observe that a trial court is bound to consider but not bound to accept a recommendation of the guardian ad litem, agency, or any other parties. The ultimate decision is for the judge. The court must act upon a consideration of all evidence presented. *In re T.S.*, 8th Dist. No. 92816, 2009-Ohio-5496, ¶ 34. Appellant argues on appeal that the trial court denied her due process rights by eliciting testimony from one of the social workers and questioning the GAL regarding the child's best interest, Evid.R. 614(B) permits a court to interrogate witnesses in an impartial manner. After reviewing the transcript, we find that the trial court acted impartially and that there was no violation of the mother's due process rights.

{¶103} We now turn to our review of the evidence. The record reflects that J.B. was removed from appellant when she was less than three months old. At the early visits, when J.B. was still a baby, appellant would hold her and attend to her needs. However, appellant's visits were mostly supervised and she had other family members present to assist her at the visits. The foster family tried to include appellant in J.B.'s life. Appellant did not seem interested in attending these events, which were provided for her to spend more time with J.B. outside of supervised visits.

{¶104} Sarah Narine testified that appellant reported being overwhelmed with the care of her second child and believed the addition of a four-year-old would make the situation worse. Although appellant eventually completed the parental classes provided in the case plan, her domestic violence and emotional issues have not been convincingly addressed. Regarding her housing issues, at the time of the custody trial, she was only able to produce a letter showing she received an assignment of an apartment unit. The GAL opined that although he thought J.B. should be returned to appellant's custody, she would need a safety plan and protective supervision.

{¶105} Grandmother Angelique was inconsistent in attending the visits, has several minor children of her own, and indicated on several occasions that she was overwhelmed. She also would get angry with the social worker in front of J.B. The GAL questioned whether the grandmother would protect and nurture J.B. if given custody.

{¶106} Although Great-grandmother Sanetta had consistently attended the visits and made progress toward her case plan objectives, she had not been open with CCDCFS with regard to her diagnosis and treatment requirements. Also, she was not initially forthcoming about her prior felony conviction for a sex crime. The GAL did note that the great-grandmother had subsequently been found suitable for custody of other children and had appropriate housing. However, even if great-grandmother were an option for placement, "[t]he statute does not make the availability of a placement that would not

require a termination of parenting rights an all-controlling factor [and] does not even require the court to weigh that factor more heavily than other factors." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 63. To have it any other way would ignore, subsume, suffocate, and deny our humanity.

{¶107} We are aware J.B.'s biological family has shown a strong desire for her to be returned to them. Family unity and blood relationship are vital factors to carefully and fully consider. To protect the child's interest, though, biological relationship cannot be controlling in itself. *In re T.W.*, 8th Dist. Nos. 86084, 86109, 86110, 2005-Ohio-6633, ¶ 15. Nor is the existence of a good relationship, in itself, controlling. *Id*. The paramount consideration now and at each stage of such proceedings is the best interest of the child. All relevant factors must be considered when making that determination. R.C. 2151.414(D)(1).

{¶108} We respect and commend the love and commitment some members of J.B.'s biological family demonstrated at various times. We must, though, consider the full record before us. No child can be truly safe, secure, and successful without dependable, consistent care. Reliance upon members of a multi-generational family to respond to the hour by hour needs of a young child, when they can manage it, is not tolerable when full-time commitment is needed.

{¶109} Similarly, although appellant has made commendable progress in participating in various programs addressing her mental health stability and parental

skills, we are reminded that, of necessity, at this stage of the proceedings, the best interest determination focuses on the child, not the parent. *In re D.A.*, 8th Dist. No. 95188, 2010-Ohio-5618, ¶ 53.

{¶110} The fact that this child has been in court-authorized foster care for several highly successful years with the same foster family is a major factor in our decision. At numerous points along the way of J.B.'s period of foster case, the trial court had to determine whether out-of-home placement would continue. The court determined several times that J.B.'s best interest was to remain with her foster family. From shortly after her birth until today, J.B. has known one uninterrupted loving family experience. We do not believe that rupturing that bond at this late date will make J.B. happier or safer. We will not do so.

{¶111} J.B., together with her cousin, has developed a true bond and a sense of security with her foster family. The foster family has provided a much needed steady, secure, and nurturing environment, both physically and emotionally. By all accounts, J.B. is thriving in that environment. For the sake of the infant or child's fundamental viability, we, as a community, must and will weigh and balance his or her total best interest. Our instinct must be to reunite families whenever possible but never at the expense of innocent life. J.B. is at the most critical developmental stage of her life. She and all children need to be cared for and nurtured in a stable, secure, and structured environment. After a careful review of the transcript of the two-day trial, we agree with

the trial court that such an environment can only be ensured by granting permanent custody to the agency.

{¶112} We further recognize that the trial court's decision is consistent with the legislature's intent to encourage the timely placement of children into a permanent home. After being in temporary custody of the agency for almost all of her life, permanency for J.B. is well overdue. "[N]eglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term * * * and their best interest is the pivotal factor in permanency case." *In re T.S.* at ¶ 35.

{¶113} Upon a thorough review of the record, we find the trial court's determination is supported by clear and convincing evidence contained in the record. The assignment of error is without merit.

{¶114} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the juvenile court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

SEAN C. GALLAGHER, J., CONCURS;
LARRY A. JONES, P.J., DISSENTS (WITH SEPARATE OPINION ATTACHED)

LARRY A. JONES, SR., P.J., DISSENTING:

{¶115} Respectfully, I dissent and conclude that the trial court abused its discretion   when it determined that the grant of permanent custody to CCDCFS was in the best interest of J.B.   Instead, I would award legal custody to the mother with the agency having protective supervision.

{¶116} The majority does a thorough job of setting forth the testimony received during the two-day trial and the relevant law and considerations; however, I must come to a different conclusion.

{¶117} As the majority opinion recognizes, because J.B. had been in the custody of CCDCFS for more than 12 months out of a 22-month period, the trial court had only to conclude what was in the child's best interest pursuant to R.C. 2151.414(D).   I will address the best interest factors in turn.

{¶118} The first factor involves the interaction and interrelationship of the child with her parents, siblings, and other relatives and significant people in her life.   R.C.

2151.414(D)(1)(a). This factor is "highly significant" and "focuses on a critical component of the permanent custody test: whether there is a family relationship that should be preserved." *In re A.W.*, 9th Dist. No. 09CA009631, 2010-Ohio-817, ¶ 14, citing *In re C.M.*, 9th Dist. No. 21372, 2003-Ohio-5040, ¶ 11.

{¶119} The majority of the evidence before the trial court in this case weighed in favor of preserving the family relationship. J.B.'s mother had completed her case plan, was bonded with her child, who called her "mommy" and verbally expressed her love for her mother; was raising her second child without CCDCFS's involvement; and was in the process of securing her own housing. She attended visitation every week, was appropriate and loving towards her child, and was alert to her child's needs. The social worker, GAL, and foster mother all testified that the mother had matured while the child was in agency custody. The mother has undeniable family support, especially that of her older sister, grandmother, and mother.

{¶120} Considering R.C. 2151.414(D)(1)(b), the GAL for J.B. reported that the child was too young to express her wishes. The GAL for the child recommended that custody be returned to the mother, finding that the mother had matured and would be able to care for her daughter, he observed her acting appropriately with both of her children, the mother took good care of her younger child, and had the assistance of her family, including her older sister, who displayed good parenting skills.

**{¶121}** Although the social worker testified that J.B. wanted to remain with the foster parents, the wishes of a young child are expressed through the GAL, not the social worker. *See In re Smith*, 9th Dist. No. 20711, 2002-Ohio-34, *16-*17 ("While the caseworker's testimony may be considered as evidence of the interaction and interrelationship of the child with the foster family, it cannot be considered as an expression of the child's wishes in lieu of the guardian ad litem's report. R.C. 2151.414[(D)(1)(b)] authorizes only the guardian ad litem to express the desires of the child.").

**{¶122}** Considering J.B.'s custodial history under R.C. 2151.414(D)(1)(c), the delay in determining the permanent custody motion was unjust to all parties involved. The agency filed for permanent custody on July 20, 2010, but the motion did not proceed to trial until February 9 and 10, 2012. The trial court issued its ruling on June 4, 2012. Thus, over a year and a half elapsed from the time the motion was filed until it was granted. While I am cognizant that there was an intervening appeal filed by the foster parents and that permanent custody proceedings take some time, a year and a half in the life of any child, but especially a child of tender years, is too long for a permanent custody motion to be pending.

**{¶123}** Considering R.C. 2151.414(D)(1)(d), and whether J.B.'s need for legally secure permanent placement can be achieved without a grant of permanent custody, the evidence overwhelmingly showed that the mother herself could provide a safe, stable, and

permanent home for J.B.  I agree with the GAL's recommendation, however, that placement with the mother be accompanied by protective supervision.

{¶124} R.C. 2151.414(D)(1)(e) states that in considering the best interest of the child, the court must consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."  The factors listed in R.C. 2151.414(E)(7) to (11) include a parent's criminal convictions, whether the parent has withheld medical treatment or food from the child, has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse, or abandoned the child, or whether the parent has previously had her or his parental rights terminated as to another child.

{¶125} There is no dispute that none of the factors in R.C. 2151.414(E)(7) to (11) apply in this case.  I cannot glean from the record that the trial court considered these factors at all.   And the fact that none of these factors apply weighs in favor of the mother and against a grant of permanent custody.   There was no evidence that the mother had any juvenile delinquencies or adult criminal convictions, mistreated or abandoned her child, and the mother was raising her younger child without agency intervention.

{¶126} During oral argument to this court, even the state conceded that this was a difficult and unusual case, one in which the decision to grant permanent custody to the agency was not clear-cut.   The mother had essentially completed her case plan and the agency gave her no further objectives to meet.   The majority states that it will not

rupture the bond J.B. has with her foster family. But while the foster family has done a commendable job of caring for young J.B. and her cousin, there is no absolute guarantee that the foster family will adopt J.B. Although it is clear from the lower court record as a whole that the foster family is interested in adopting J.B., when the state asked the foster mother her intentions during trial, the court did not allow the foster mother to answer, instead stating, "I don't think that's a factor [for the court] to consider." (Tr. 22.)

{¶127} This uncertainty, however slight it may be, must be juxtaposed with the mother's ability to parent her child and the mother's extensive family support. And although J.B. has been living with the foster family for most of her short life, she knows and loves her mother, little brother, and the rest of her family. To grant permanent custody to the agency is to tear those bonds apart — permanently. In many cases, doing so is the only option. But here, in a case such as this, to do so is a grievous error, one that will have lasting detrimental impact on all involved.

{¶128} Because the mother has shown that she is presently able to parent her child, the court should not have taken the drastic, harsh, and irrevocable step of terminating mother's parental rights. Simply put, to permanently cut the bonds of this mother and her family to J.B. would not be in the child's best interests and the state failed to show otherwise by clear and convincing evidence.

{¶129} For these reasons, the trial court's decision to grant permanent custody of the child to CCDCFS was not supported by competent, credible evidence. Accordingly, I would conclude that the trial court abused its discretion when it determined that permanent custody was in the best interest of the child. I would: (1) reverse the trial court's decision granting permanent custody to CCDCFS and (2) grant legal custody of J.B. to the mother with protective supervision.