[Cite as *In re L.J.R.*, 2022-Ohio-1074.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE L.J.R. | : | |
| Minor Child | : | Nos. 110836 and 110847 |
| | : | |
| [Appeal by Father, R.R., and Mother, B.W.] | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 31, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-17-908686

---

### *Appearances:*

The Goldberg Law Firm and Adam Parker, *for appellant* R.R.

Brian A. Smith Law Firm, LLC, and Brian A. Smith, *for appellant* B.W.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

ANITA LASTER MAYS, P.J.:

{¶ 1} Appellants, R.R. ("Father") and B.W. ("Mother"), unmarried, filed these consolidated appeals of the trial court's termination of their parental rights to their minor child L.J.R. and the award of permanent custody to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). We affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} L.J.R. had been previously adjudicated neglected, removed from Mother's custody, and committed to the legal custody of Father in September 2010. *In re L.R.,* Cuyahoga C.P. No. AD-10-910510. On June 2, 2017, CCDCFS filed a motion for predispositional temporary custody and a complaint for temporary custody based on neglect.

{¶ 3} Preadjudicatory temporary custody was awarded to CCDCFS at the August 18, 2017 hearing. The parties appeared represented by counsel at the January 3, 2018 hearing and stipulated to an amended complaint to adjudicate the child as dependent under R.C. 2151.04. The period of temporary custody was extended on August 8, 2018, and December 4, 2018.

{¶ 4} CCDCFS moved for permanent custody on April 24, 2019, and on October 1, 2020, filed an amended motion to award legal custody to paternal grandfather, H.R. ("Grandfather"). On April 26, 2021, the agency modified the motion seeking permanent custody. On July 21, 2021, Father moved to grant legal custody to Father or Grandfather.

{¶ 5} The case was tried on August 3, 2021. The state presented two witnesses: social worker Angela Scott ("Scott") of Mohican Young Star Academy ("Mohican") and social worker Stacey Johnson ("Johnson") with CCDCFS. L.J.R.'s paternal aunt L.R. ("Aunt"), Grandfather, Father and social worker Keara Mullen ("Mullen") testified as Father's witnesses. The guardian ad litem ("GAL") provided a recommendation.

### A. Social Worker Johnson

{¶ 6} L.J.R.'s case was assigned to Johnson in September 2020, and she was familiar with the case history and file. L.J.R. was 12 years old at the time of the trial. Johnson testified that L.J.R. was removed from Mother's custody in 2010 and custody was granted to Father due to Mother's inability to meet the child's medical needs, provide stable housing, and address her own mental health issues.

{¶ 7} L.J.R. had been diagnosed with attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), oppositional defiant disorder ("ODD"), and reactive attachment disorder ("RAD"). In 2017, L.J.R. was still wearing training underwear and exhibited aggression and inappropriate sexually aggressive behavior toward others. Father was also caring for another son, C.R., who was one-year older than L.J.R.

{¶ 8} Johnson stated Father "was overwhelmed with L.J.R.'s behaviors, was demonstrating excessive discipline, and showing unstable mental health within himself." (Tr. 38.) The agency was concerned with Father's inability to manage his anger and sought removal of L.J.R. from his care. Mother was not consistently

involved with L.J.R. and the agency was not sure that Mother's mental health issues had been resolved. The agency determined that Father was able to meet the needs of C.R. who did not have special needs issues and C.R. was allowed to remain with Father.

{¶ 9} CCDCFS's placement attempts for L.J.R. were difficult. A family member's placement was unsuccessful after six weeks because they could not meet L.J.R.'s treatment needs. A 13-month placement in specialized foster care ended due to charges of neglect and abuse of L.J.R. and the other foster children in the home. (Tr. 41.) An 18-month placement in specialized care ended when L.J.R. was placed with Grandfather. Placement with Grandfather ended 64 days later when L.J.R. became angry with Grandfather and pushed him over a coffee table after Grandfather confronted him for inappropriately touching the grandmother. Johnson also testified that Father and L.J.R. told her that a named female raped him, and that two other people were involved during the period of an earlier placement.

{¶ 10} Johnson advised that L.J.R. received group and independent therapy during his placements and was enrolled in a program for at-risk children with sexual behaviors shortly before placement with the paternal grandparents. At the recommendation of Fairview Hospital, L.J.R. was placed at Mohican in January 2021, for a more restrictive therapeutic environment where L.J.R. receives one-on-one supervision due to his impulsive behaviors and multiple therapies. (Tr. 91.) Johnson receives incident reports from Mohican of L.J.R.'s inappropriate sexual

behavior or aggression "once, twice, maybe three times a day" and received 17 reports the month before trial. (Tr. 46.)

### 1. Visitation

{¶ 11} For the first few months after the agency received temporary custody in 2017, the parents consistently visited L.J.R. for biweekly two-hour periods accompanied by a visitation coach who assisted with managing L.J.R.'s behaviors. The parents' attendance remained constant when the schedule was changed to weekly visits with visit coach assistance. By December 2018, the parents were allowed weekly unsupervised visits for up to four hours at Father's home or in the community. Johnson advised that the parents participated wholeheartedly and were patient with L.J.R. with the guidance of the visit coach.

{¶ 12} By February 2019, L.J.R.'s aggressive behaviors began to increase, and Father's visitation was terminated.

> The visits stopped for the reasons of L.J.R.'s behavior, dad's irregular mood swings, aggressive behavior, and those [sic] and they were stemming from those unsupervised visits. And also at the time, the therapist had expressed to dad that with L.J.R.'s inappropriate sexual behavior, he needed to constantly have someone to supervise him, and dad was not in agreement to that level of supervision for his son.
>
> * * *
>
> [Father's] anger was escalated to uncontrollable heights. There were aggressive threats that were being made.
>
> * * *
>
> Threats to Children and Family Services staff, to the foster dad, and to the school representatives who were there at the meeting.

(Tr. 51-52.)

{¶ 13} Mother was allowed to continue weekly two-hour visits in the community. In April 2020, Mother's visits stopped, and the agency was unable to contact her. Johnson was able to establish contact with Mother in February 2021 when Father provided a telephone number. Based on the file, it did not appear to Johnson that Mother attempted to contact the agency during that period.

{¶ 14} Weekly two-hour supervised visits were granted to Father when L.J.R. was placed at the home of the paternal grandparents in November 2020. Johnson observed during visits that the family was bonded but Father still struggled with L.J.R.'s behaviors.

{¶ 15} L.J.R. was placed at Mohican in January 2021. Due to COVID, Father and Grandfather visited L.J.R. by Zoom every other Sunday and each was allowed one telephone call per week. In-person visitation was reinstated in March 2021, and Father and Grandfather visited every other Sunday under staff supervision. Arrangements were made for Mother to begin visits in February, but Mother's sole visit occurred the Sunday prior to trial.

### 2. Case-Plan Objectives

### a. Father

{¶ 16} Father's case objectives were anger management, parenting, psychiatric evaluation, a recommendation to follow all prescribed services, and suitable housing.[1] Father completed anger management in 2017. Johnson stated:

---

[1] Father indicated to the agency at the time the plan was prepared that he was moving to a new residence and was compliant with the housing requirement at the time of trial.

> Taking over the case originally, my first encounter was over the telephone during an SAR meeting with [Father]. He was very upset, yelling, would not let us get words in edgewise during the conversation, whenever the conversation was going in a direction that he was not comfortable with. He was shouting, he was loud, he was angry, he — it took — there was a social worker * * * that would calm him down and refocus him and engage him back in the conversation where he could engage with us appropriately.

(Tr. 61.) "It made me concerned for L.J.R. and his behaviors in [Father's] care because they can become very challenging." *Id.* Johnson added that as of the time of trial, she believed Father "has his anger management in a place that he is trying very hard to manage it. I cannot say he has completely overcome it." (Tr. 63.)

{¶ 17} Father also completed a parenting class in 2017 and a nurturing class in 2018. Johnson observed Father exercise restraint and attempting to talk things through with L.J.R. but remained concerned due to L.J.R.'s intellectual age of six to eight years and continued inappropriate behaviors. Father, Grandfather, Mother and Mother's fiancé were to be included in a parenting class that had been specifically designed for L.J.R. by Rainbow Babies and Children's Hospital ("Rainbow Hospital") just a few months prior to trial.

{¶ 18} Father attended the first class that was held on July 30, 2021. The class was scheduled to continue until L.J.R. could also participate and Father could learn a "discipline pyramid * * * can utilize in connection with L.J.R. and his behaviors" once L.J.R. could be released to Father. (Tr. 82.) The class was expected to continue indefinitely based on the unique design and unpredictable period of assimilation between the parents and L.J.R.

{¶ 19} Father's 2017 mental health evaluation was inconclusive, and the 2018 evaluation recommended individual psychiatric counseling for anxiety and depression. Father has been attending the appointments and takes his medication. Johnson conceded that the second extension for temporary custody was due to the child's behavior and not due to Father's failure to comply with his case plan.

### b. Mother

{¶ 20} Mother's case plan was for her to submit for psychiatric evaluation and to develop a relationship with L.J.R. Mother attended the evaluation but Johnson could not discern from the case file why Mother did not follow up for the assessment. Mother was diagnosed with a bipolar disorder in 2010 that was not being treated. Mother denied shortly prior to trial that she has mental health concerns.

{¶ 21} The requirement to develop a relationship with L.J.R. was imposed due to gaps during L.J.R.'s childhood where Mother was not involved and the unexplained lack of visitation or communication in 2020 to early 2021. In addition to the single Mohican visit the Sunday before trial, L.J.R. initiated contact with Mother on her birthday in February or March 2021. Mother participated in agency meetings regarding L.J.R. between 2017 to early 2019.

{¶ 22} After Johnson reestablished contact with Mother in February 2021, she visited Mother at home on February 20, 2021, and several times thereafter. Johnson informed Mother that she had been placed on the visitation list right away, though Mother called Johnson several times after that meeting and asked whether

she was on the Mohican list. Johnson confirmed that Mother could have attended Rainbow Hospital sessions but did not attend the first and only meeting held prior to the trial.

### c.      Best interest of L.J.R.

{¶ 23} Johnson testified that the grant of permanent custody to the agency was in L.J.R.'s best interest:

> L.J.R.'s mental health and his behaviors are — are so complex, and right now he is in a treatment facility that is providing all of those needs and that supervision for L.J.R. And even being in the midst of this facility with all of this certified staff, they still have to employ one person that is actually with L.J.R. and to provide L.J.R. with the supervision that he needs to keep himself safe and other — and his peers in that facility safe.

(Tr. 74.)

{¶ 24} Johnson did not believe the parents could provide a safe and permanent home for him in the foreseeable future.

> Where [Father] is concerned, we had an evaluation that was done by Rainbow Babies & Children's [Hospital] that spelled out everything that L.J.R. would need, and instead of following going to those providers, dad has gone and found providers that he feels that could do better for L.J.R. without them seeing the information, the referrals, or the recommendations, so it leads me to believe that he would not carry out the things that are actually giving L.J.R. the progression that he's having today. His structured environment, the therapeutic therapy that he needs, and provide those needs for him.

(Tr. 75.)

{¶ 25} Johnson also opined that Father did not seem to understand the level of care that L.J.R. required and that Father had not arranged for doctors and a school for L.J.R. as he claimed.

Because none of those doctors or even that school has reached out to Children and Family Services or myself to find out the details or any recommendations or contact anyone at Mohican to find out exactly L.J.R.'s diagnosis and his help that is — his treatment that is needed.

(Tr. 47.)

{¶ 26} As to Mother, Johnson said:

[Mother] has only been involved shortly — a short time, so I can't really make a prediction because I don't see the interaction between her and L.J.R. I don't see her involved in his treatment plan to be able to say one way or the other, but since she's not aware of these behaviors one-on-one, I find it — I feel that it would be very difficult for her to provide for him.

*Id.*

{¶ 27} Due to the physical incident that required L.J.R.'s removal from Grandfather's residence and L.J.R.'s challenges, Johnson did not believe that Grandfather would be able to meet L.J.R.'s needs. Johnson conceded that residential treatment facility placement was recommended for L.J.R. in 2019 but was deemed unfeasible due to his age. Mohican requested L.J.R.'s removal during his first month for fear of influences of the older children regarding L.J.R.'s behaviors. L.J.R. was still wearing training underwear and exhibited aggressive sexual behaviors upon his arrival at Mohican.

{¶ 28} Johnson did not believe that L.J.R. could be reunified with Father or Grandfather for at least the next few years because L.J.R. needed to complete the Mohican program. Johnson explained during cross-examination by Father that she had applied for L.J.R. to receive assistance from the Board of Developmental and Disability Services ("BOD") due to his cognitive age of approximately six years old.

Johnson: I actually have a recommendation into them right now. I'm waiting to get a full acceptance of what services could be offered through them.

Counsel: Okay. And do you know why [L.J.R.] wasn't connected to the Board of DD prior to you being on this case?

Johnson: No, I do not.

Counsel: Do you know if that was ever even a discussion?

Johnson: To my knowledge, I do not.

Counsel: Okay. And the Board of DD can also provide services for [L.J.R.]; is that correct?

Johnson: It is correct.

(Tr. 93-94.)

{¶ 29} Johnson also testified that the agency requested that the trial court hold the motion for permanent custody in abeyance to see how L.J.R. progressed at Mohican. The agency filed the current motion for permanent custody after the trial court refused to allow another continuance. (Tr. 96.) At the time of trial, L.J.R. had been in agency custody for four years. Jackson could not say that L.J.R. would complete the Mohican program by his 18th birthday.

### B. Social Worker Scott

{¶ 30} Scott was employed by Mohican and served as a therapist under licensed therapist oversight. Scott provides individual counseling biweekly to L.J.R. and group counseling weekly.

**{¶ 31}** Scott testified that L.J.R. arrived at Mohican with a history of "quite a bit of trauma in his past" and described L.J.R.'s behavior since his arrival at Mohican. (Tr. 18).

> [L.J.R.] has very — very intense behaviors. His — basically, he came to us presenting with very sexualized behaviors, including sexually inappropriate comments, suggesting sexual acts with — or requesting sexual acts with both peers and staff. He is — he often — He's very impulsive, so he will grab the genitalia of peers and staff, especially female staff. It's — he's very impulsive and he has very sexualized behaviors.

(Tr. 17.)

> **{¶ 32}** Also,

> [w]hen [L.J.R.] was first admitted, he was demonstrating [the behaviors] probably the majority of the day. I would say anywhere from 25 to 50 times between the comments, the gestures, the — the actual actions of grabbing people.

(Tr. 17-18.)

**{¶ 33}** Scott added that L.J.R.'s undesirable behaviors have decreased to some extent:

> We do have incident reports here that we keep track of, and as I am completing his monthly progress reports, I am finding that he is having less of those incidents, but they are still definitely occurring still numerous times a week.

> * * *

> He also does have some physical and verbal aggression, mostly in a reactive state with his peers.

(Tr. 18-19.)

{¶ 34} Scott also advised that L.J.R. has one-on-one supervision during waking hours and constant night checks. Male staff members are assigned to reduce the temptation to engage in sexual behaviors.

{¶ 35} Regarding an estimated release date for L.J.R., Scott explained:

> Typically, when we are still in the first couple phases of their treatment, we — we push out the estimated date about nine months, six to nine months, and the reason being is in the — Mohican is a five-phase system, and the first phase is orientation, the second phase is learning, and it often takes more than the typical amount to deal with all of the past traumas and behaviors, so the end point is harder to determine or make a guess.
>
> * * *
>
> Until they get on the third phase or even the fourth phase, it's very difficult to determine an estimated discharge date.

(Tr. 29-30.) L.J.R. "is on the learning phase." (Tr. 34.)

### C. Grandfather

{¶ 36} Grandfather testified that he has a close relationship with L.J.R. Father and L.J.R. lived at Grandfather's home from 2010 until 2014 when they moved nearby. Grandfather continued to remain closely involved including during L.J.R.'s placements when allowed.

{¶ 37} L.J.R. was on multiple medications when he was placed with Grandfather in 2020 but Grandfather said that L.J.R. "was just not doing right." (Tr. 119-120.) Grandfather called Johnson who instructed him to take L.J.R. to the Fairview Hospital psychiatric ward.

{¶ 38} Grandfather stated the visits at Mohican have gone well. "[H]e has settled down a whole lot, and he's [calmer] now. They've got him on the proper

medications. And he seems to be doing pretty good." (Tr. 121.) Grandfather also testified that L.J.R. has a great relationship with Father and sibling C.R. and has always wanted to live with Father. Grandfather added that Father called CCDCFS for help with L.J.R. because he could not find it anywhere else. Grandfather opined that granting permanent custody will "be the end of [L.J.R.]. He'll have no hope left." (Tr. 122.) Grandfather offered to assume custody if Father was denied. However, he admitted that he cannot provide the level of care that L.J.R. requires.

### D. Paternal Aunt

{¶ 39} Aunt confirmed L.J.R.'s attachment to Father and positive relationship among family members. Aunt also said that L.J.R. has begged to go home to Father and added, "I am in a position to be there for [Father] whenever he needs me." (Tr. 136.) Regarding L.J.R.'s behavioral problems, Aunt stated:

> My understanding — L.J.R. went through a lot, and we didn't know in the beginning what was going on with him. And when we found out, it all made sense. My heart goes out to him and we just want to be there for him. And I just feel like the situation that he's in now [with social services], kids don't do well in that situation, they don't. They don't thrive. They need family. They need love. And we love him. We would never do anything to hurt him.

(Tr. 135.)

{¶ 40} Aunt also found fault with the agency.

> They've never given our family a chance. I do not even know who [the social worker] is. I have never met her. I talked to her one time on the phone. I do not even know her name. But — and none of them have given us a chance. If they were to get to know us, they would find out we are not what is going on.

> [Social services] have had him in every home that has beaten him, verbally abused him, and sexually abused him. When he was with my

brother, none of that — my brother did none of that to him. But in social service's custody, he has been in multiple homes that have done that to him.

(Tr. 137-138.)

{¶ 41} Aunt admitted that part of L.J.R.'s trauma occurred before he was in agency custody but stated that Father had been trying to get help for L.J.R. since L.J.R. was three years old. Aunt also named the people that L.J.R. accused of molesting him while in temporary custody.

### E. Social Worker Mullen

{¶ 42} Father's final witness was Keara Mullen, a social worker for the Cuyahoga County Office of the Public Defender. Mullen was assigned to Father's case in December 2018 while employed with the juvenile division and retained the case thereafter. Mullen testified about the lack of cooperation by the agency prior to Johnson's assignment to the case, disruptions in the provision of medications and therapy for L.J.R., and other difficulties encountered by Father up to the time of trial.

{¶ 43} The initial agency social worker failed to respond for several weeks to a request from Mullen to schedule Father's second psychological evaluation and the email response that was finally received contained misinformation. Mullen called the worker who agreed a psychological evaluation referral would be issued in March 2019. Mullen first learned that Father's visitation was suspended at the agency's request when checking the court docket. A motion was filed to reinstate visitation.

{¶ 44} Mullen attended the semiannual review ("SAR") meeting for Father's case plan in May 2019. Father and Grandfather were present as well as the agency social worker and her supervisor. Mullen stated the atmosphere was extremely tense. The worker turned her back to the attendees at the meeting table and would only address the facilitator or the agency supervisor.

{¶ 45} Mullen inquired about the psychological evaluation referral, and the agency worker announced to the facilitator that Father refused to sign a release. The agency worker handed the release to the supervisor to hand to Mullen to hand to Father though all were sitting at the same table. The evaluation was finally conducted in July.

{¶ 46} Mullen cited additional perceived deficiencies in the way the case was being conducted and decided to become more active. Mullen referenced as an example of particular concern that the handwritten record of the SAR meeting distributed by the facilitator and signed by the attendees was "drastically different than the typed SAR that was filed that still had my name attached to it as a signature, because that was certainly not what happened at the SAR." (Tr. 157.) "[I]n the typewritten one that was filed, there was mention of allegations against the father of comments that were made that were never discussed in the SAR." *Id*.

{¶ 47} Mullen discovered that L.J.R.'s therapies and medications were disrupted during the multiple placements. For example, no therapy was administered from the April 2019 foster home removal to at least August 2019. After the initial social worker was replaced, Mullen reached out to the agency

supervisor to see whether supervised visitation could be arranged for Father. Mullen also discovered that a forensic interview with L.J.R. was conducted at the Domestic Violence Child Advocacy Center in December 2019 regarding the alleged sexual abuse of L.J.R. As of the time of trial, Mullen was unable to find out the status of the investigation.

{¶ 48} The interaction with the agency improved when Johnson took over L.J.R.'s case. Mullen found Johnson and her supervisor to be capable and compassionate toward Father. At the March 2021 meeting with the agency, Mullen learned of the pending withdrawal of the motion to grant legal custody to Grandfather and reactivation of the permanency motion. Mullen stated she was told the change was due to the family's inability "to afford the residential care that the child was receiving." (Tr. 175.)

{¶ 49} At the May 2021 meeting with the Rainbow Hospital's medical team, Mullen, Father, and Grandfather learned that L.J.R. had been misdiagnosed.

> Mullen: I have a mental health background, and so my understanding of it was the ADHD symptoms were misinterpreted, and so he was misdiagnosed with the ADHD. And, in fact, those symptoms usually stereotyped as ADHD were more actually trauma responses, from his trauma history, and so he — like his RAD diagnosis, ADHD diagnosis, that kind of stuff was ruled out by the providers and there was a more accurate diagnosis of PTSD.

(Tr. 176.) Thus, the medication and therapy protocols that L.J.R. had been receiving were not designed for PTSD.

**{¶ 50}** Mullen participated in the SAR conference all that month and stated the participants were calm and cooperative. "It was my impression that, obviously, the family wanted to be reunified, but [the family] also understood that * * * the child needed continued services." *Id.*

**{¶ 51}** Mullen and Johnson continued to pursue options for custody to remain with the family:

> So after the SAR, it came to my attention from a conversation I had with [Johnson], as well as my own research into options for both child welfare and delinquent kids who need residential [treatment], like how do people afford it, but it is actually an option through the Board of Developmental Disabilities to have people maintain custody — parents maintain custody while their child's necessary services are continued if they're involved with the Board of DD. And so I had a conversation with [Johnson] in June about how she was going to explore that possibility.

(Tr. 177.)

**{¶ 52}** During cross-examination, Mullen was asked whether the agency considered less restrictive options prior to filing for permanent custody. Mullen responded, "Not the least restrictive, no. * * * They never considered Father." (Tr. 182.)

### F. Guardian Ad Litem

**{¶ 53}** The GAL recommended awarding permanent custody to the agency.

> [L.J.R.] does have massive needs, he does. And no one person that I have seen can adequately address them. He has been in foster homes, and there have been a couple of them that were good people and capable and they have had kids that have had a lot of needs before, but this was a little different thing all together.
>
> There was testimony that he needs to be supervised morning, noon and night, 24 hours a day. And that is 100 percent certain.

(Tr. 187.)

{¶ 54} The GAL's testimony and reports reveal that L.J.R. is incapable of "coherently expressing his wishes and desires in regard to his legal situation." GAL report, p. 1 (July 6, 2021). "The minor child has serious behavioral issues and very low intellectual functioning but also an understanding of sexual activity well beyond his years." *Id.* The GAL added that L.J.R. did not disclose to the Cuyahoga County prosecutor's office that any sexual abuse had occurred.

{¶ 55} The GAL concluded that both parents have limited intellectual abilities and would not be able to address L.J.R.'s needs if L.J.R. was to "return home." *Id.* at p. 3.

> My first thought is that kids should be with their parents. Everybody in this room does. But there is just no way in my estimation that [Father] right now or in the foreseeable future can provide the care * * * that [L.J.R.] needs. And it is unfortunate because I know he wants it.

(Tr. 188.)

{¶ 56} As to the paternal grandparents, the GAL stated that he originally recommended that they be given a chance. The GAL determined the grandparents were "well-meaning," appropriate care givers who could provide for basic needs but could not manage L.J.R.'s special needs as evidenced by the incident requiring L.J.R.'s removal from their custody.[2] (Tr. 188.)

{¶ 57} Though the GAL stated that L.J.R. is unable to indicate his wishes, the GAL offered that L.J.R. is "content where he's being cared for." (Tr. 189.)

---

[2] The grandmother passed away shortly after that incident.

I know he loves his father and I know he has a bond with his father, and even his brother, for that matter, but — You know, I gave him, as you said, an opportunity to express all his wishes, and he has in his way. But I won't lead him down a path as to what to say and how to say it, if that's what you're asking me to do.

* * *

Did he ever say I want to go live with my daddy directly to me? No. But do I think that's probably what he wants? Yes, I do. I truly do.

(Tr. 190-191.)

{¶ 58} The GAL visited L.J.R. via Zoom at Mohican in January and July 2021, but conducted no in-person visits. The GAL added that usually L.J.R. did not answer the GAL's questions because L.J.R. was so "jumpity." (Tr. 193.) However, the Mohican counselor advised the GAL that L.J.R.'s behaviors were improving with proper counseling and medication. The GAL also said that he did "not think [that] before [L.J.R.] went [to Mohican] he was regularly taking his medication." *Id.*

{¶ 59} The GAL decided that permanent custody to the agency is in L.J.R.'s best interest because L.J.R. "needs to be in a group home setting where he has constant supervision and access to professionals." *Id.* at p. 3.

It is the recommendation of the undersigned that the child remain outside the home and that the child remain in a group home setting. It is the recommendation of the undersigned that the CCDCFS motion for permanent custody be granted.

It is the further recommendation of the undersigned that temporary custody be continued until further order of court. My ward needs to stay in the current residential facility so his specialized needs can be addressed.

GAL report, p. 4 (Jan. 27, 2020).

### G.    Judgment

{¶ 60} The parties submitted findings of fact and conclusions of law.  On August 30, 2021, the trial court granted permanent custody to the agency.  On September 8, 2021, the trial court issued a nunc pro tunc to clarify that the parental rights and responsibilities of both Father and Mother were terminated.

{¶ 61} Father and Mother appeal separately.  The cases are consolidated for appeal.

## II.    Assignments of Error

### A.    Father's Assignment of Error

> The trial court abused its discretion by awarding permanent custody to CCDCFS.

### B.    Mother's Assignments of Error

> I.    The trial court's grant of permanent custody to CCDCFS was against the manifest weight of the evidence.
>
> II.    The trial court's grant of permanent custody was in error because CCDCFS did not show that it made "reasonable efforts" to reunite the family pursuant to R.C. 2151.419.

## III.    Permanent Custody

{¶ 62} It is undisputed that

[t]he right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re* Murray, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).  However, this right is not absolute.  It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In*

*re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

*In re I.R.*, 2021-Ohio-3103, 179 N.E.3d 138, ¶ 54 (8th Dist.)

{¶ 63} Also,

> [b]ecause termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

*Id.* at ¶ 55.

## IV. Standard of Review

{¶ 64} To terminate parental rights and grant permanent custody to a county agency, the record must demonstrate by clear and convincing evidence the following: (1) the existence of one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (d); and (2) permanent custody is in the best interest of the child. *In re S.H.*, 8th Dist. Cuyahoga Nos. 97992, 97993, and 97994, 2012-Ohio-4064, ¶ 27. "Clear and convincing evidence" is that quantum of evidence that instills in the trier of fact a firm belief or conviction as to the allegations sought to be

established. *In re Y.V.*, 8th Dist. Cuyahoga No. 96061, 2011-Ohio-2409, ¶ 13, citing *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 65} The focus in a best interest determination is on the child, not the parent. *In re P.B.*, 8th Dist. Cuyahoga Nos. 109518 and 109519, 2020-Ohio-4471, ¶ 76, citing *In re N.B.,* 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 59. When determining the child's best interest pursuant to R.C. 2151.414(D)(1), courts analyze the following factors: (a) the interaction and interrelationship of the child with others; (b) the wishes of the child; (c) the custodial history of the child; (d) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (e) whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply.

{¶ 66} "Although the juvenile court is required to consider each statutory factor in determining what is in a child's best interest under R.C. 2151.414(D)(1), no one factor is to be given greater weight than the others." *Id*. at ¶ 76, citing *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. "Only one of the factors needs to be resolved in favor of permanent custody to terminate parental right." *Id*. at ¶ 77, citing *In re A.B.*, 8th Dist. Cuyahoga No. 99836, 2013-Ohio-3818, ¶ 17; *In re N.B.* at ¶ 53.

{¶ 67} We also recognize that "[a] juvenile court has considerable discretion in weighing the factors set forth in R.C. 2151.414(D)(1)." *In re P.B.* at ¶ 77, citing *id*. When reviewing a juvenile court's judgment in child custody cases, the Ohio

Supreme Court has stated that the "court's decision in a custody proceeding is subject to reversal only upon a showing of abuse of discretion." *In re A.J.*, 148 Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ 27, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 417, 674 N.E.2d 1159 (1997). An abuse of discretion "implies that the court's decision was unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## V. Law and Analysis

{¶ 68} We combine the errors for ease of analysis. The trial court has authority to grant permanent custody to CCDCFS where, as in this case, a child has been adjudicated as neglected, dependent, or abused.

> When an agency files a permanent custody motion under R.C. 2151.413 after obtaining temporary custody, the guidelines and procedure set forth under R.C. 2151.414 apply. Division (B) of R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court. Pursuant to this division, before a trial court can terminate parental rights and grant permanent custody to a county agency, the court must find by clear and convincing evidence (1) the existence of any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e), and (2) that granting permanent custody to the agency is in the best interest of the child.

*In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 45 (8th Dist.).

{¶ 69} "Only one of the four factors must be present for the first prong of the permanent custody analysis to be satisfied. Once the juvenile court ascertains that one of the four factors listed in R.C. 2151.414(B)(1) is present, then the court proceeds to an analysis of the child's best interest." *In re J.B.*, 8th Dist. Cuyahoga No. 98565, 2013-Ohio-1705, at ¶ 80-81.

{¶ 70} L.J.R. was initially adjudicated neglected and legal custody was removed from Mother and granted to Father in September 2010. The agency moved for temporary custody in the instant case on June 2, 2017. As the trial court journalized:

> The Court finds that the child has been in temporary custody of CCDCFS for twelve or more months of a consecutive twenty-two-month period. The child was placed in the custody of CCDCFS in October 2017, sixty (60) days after the initial removal, and the motion for permanent custody was filed more than three years later in April 2021.

Journal entry No. 0914994779 p. 3 (Aug. 30, 2021.) The child remained in temporary custody throughout the period, for almost four years. Thus, the first prong under R.C. 2151.414(B)(1)(d) has been satisfied. *See In re N.M.P.*, 160 Ohio St.3d 472, 2020-Ohio-1458, 159 N.E.3d 241, ¶ 29.

{¶ 71} Moving on to the best interests of the child pursuant to R.C. 2151.414(D)(1) and 2151.414(E)(7) to (11), the trial court stated:

> Upon considering the interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster parents; the wishes of the child; the custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

Journal entry No. 0914994779, p. 3 (Aug. 30, 2021).

{¶ 72} There is no dispute that L.J.R. has significant special needs and is finally, after multiple placements, hospitalizations, and crisis interventions, in a location that is truly in his best interest. The record shows that the family, particularly Father and Grandfather, are closely bonded with L.J.R. Father and Grandfather have been working toward reunification. Father completed all agency requirements and is still undergoing counseling on his own volition.[3] Grandfather has also been involved in the agency meetings and was a candidate for legal custody until the December 2020 incident, and Grandfather and Father have remained closely involved with L.J.R.

{¶ 73} We also observe that Rainbow Hospital determined during the April 2021 evaluation of L.J.R. that the child was being medicated and treated based on inaccurate diagnoses. As Johnson shared, "we came to the conclusion" that they would have to employ "different techniques that are used with L.J.R. than the techniques that dad was taught in those parenting classes." (Tr. 65.) The Rainbow Hospital parenting class was "designed exclusively for L.J.R." (Tr 63.) Grandfather and Father participated in the single meeting held on July 30, 2021, just a few days prior to trial, and testified that they planned to continue to attend.

---

[3] According to the testimony, Father had been seeking help for L.J.R. for years and the agency filed for custody because Father contacted them for help in managing L.J.R.'s unique needs. This fact, coupled with the lack of responsiveness of the prior social worker, may have contributed to the frustration that Father angrily voiced that resulted in his temporary suspension from visitation.

{¶ 74} Mother did not attend the first Rainbow Hospital meeting but requested that she and her fiancé be permitted to attend.[4] Also, Mother endorses the grant of legal custody to Father or Grandfather and desires to work on her relationship with L.J.R.

{¶ 75} What the record does not reveal is how the misdiagnoses may have impacted L.J.R.'s behavior and development over the years, though the record does confirm that there were periods of time that L.J.R. was not receiving any of the prescribed medication or therapy during his placements. It also confirms by the agency's own admission that the parenting classes that Father was required to attend and did complete could not and did not prepare him to deal with L.J.R.'s issues.

{¶ 76} We also observe that as of April 2021, the agency's motion to award legal custody to Grandfather was still pending. At the April 5, 2021 pretrial, the agency requested a continuance of the agency's motion to grant legal custody to Grandfather due to L.J.R.'s placement at Mohican and the ongoing evaluations for treatments. Agency counsel advised the court at the pretrial:

> So at this time, we are asking that that motion be continued. We do understand from this Court's last Journal Entry that no further continuances will be granted, and the Agency did meet and hold a staffing, and the back-up plan would be to file for permanent custody at this point if the child cannot be stepped down due to the trial court's journal entry that no further continuances will be granted, and the agency did meet and hold a staffing, and the back-up plan would be to

---

[4] Johnson stated she could not make a prediction about Mother's reliability due to the gap in her involvement with L.J.R. "I do not see her involved in his treatment plan to be able to say one way or the other, but since she's not aware of [L.J.R.'s] behaviors one-on-one, I find it — I feel that it would be very difficult for her to provide for him." (Tr. 75.)

file for permanent custody at this point if the child cannot be stepped down [to the next phase of the Mohican plan].

(Tr. 5.) Pretrial, p. 5 (Apr. 5, 2021).

{¶ 77} The agency also informed the trial court of the in-depth evaluation that Rainbow was going to perform later in April.

> The appointment is [on] the 27th, again, and then a week after that, they will meet with everyone, the staff at Mohican, dad, myself, and we'll be able to sit down and actually find out everything that's going on with L.J.R. and come up with a productive plan for him.

(Tr. 5.) Pretrial, p. 7 (Apr. 5, 2021). The GAL requested a copy of the Rainbow Hospital report when issued. "I have been waiting for this for a long while, so I want to make sure I get a copy of it when it's prepared so I know — I have been saying this had to be done a long — for a long time." (Tr. 9.) Pretrial, p.9 (Apr. 5, 2021). The trial judge granted a continuance to June 2, 2021. On May 25, 2021, the June hearing was cancelled.

{¶ 78} According to the record, the next proceeding was the July 6, 2021, arraignment. Mother did not attend the April pretrial but appeared at the arraignment due to the agency's filing to move forward with permanent custody. In response to the trial court's inquiry as to what type of hearing should be scheduled next, the GAL recommended that the next hearing be a trial since "we have pretried this case to death. * * * It's ready to go." *Id*. at tr. 13-14.

{¶ 79} The record supports the efforts of Grandfather and Father to retain custody of L.J.R. and to continue working with Rainbow Hospital under the personalized case plan formulated a few months before trial when Rainbow Hospital

rendered the proper diagnosis of L.J.R.'s special needs. The record does not reflect whether the agency was able to determine whether BOD would finance the Mohican services if legal custody to Grandfather or Father was granted. While Mother's visitation is sporadic, she states on appeal that she would like visitation rights while L.J.R. is in Grandfather's or Father's legal custody to nurture the relationship. The trial court and all of the parties agreed that L.J.R. requires special residential care such as that provided by Mohican, but the parents and Grandfather are unable to afford such services.

{¶ 80} The trial court listed its findings of fact and determined that the allegations of the motion for permanent custody had been proven by clear and convincing evidence, and there was probable cause for removal under R.C. 2151.31. Also,

> that reasonable efforts were made to prevent the removal of the child from her home, or to return the child to the home, and to finalize the permanency plan, to wit: reunification. These services included parenting courses, mental health evaluations and treatment, and anger management treatment.

Journal entry No. 0914994779, p. 3 (Aug. 30, 2021).

{¶ 81} The trial court recognized that Father had "demonstrated compliance with case plan objectives and substantially completed each requirement." *Id.* at p. 4. "However, completion of a case plan does not in and of itself require that children be reunified with parents who have failed to remedy the conditions which led to the removal in the first place." *Id.*, citing *In re J.L.*, 8th Dist. Cuyahoga No. 84368, 2004-Ohio-6024.

{¶ 82} The trial court added,

The statute requiring the Agency to demonstrate that it has made reasonable efforts to prevent the removal of the child, to eliminate the continued removal of the child from the home, or to make it possible for the child to return safely home does not apply to motions for permanent custody. *In re B.S.*, 2009-Ohio-5497, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104.

*Id*. The motion for legal custody to Grandfather was also denied.

{¶ 83} We reiterate that

[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record. *See Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273, 1276 (1984); *cf. Miller v. Miller*, 37 Ohio St.3d 71, 523 N.E.2d 846 (1988). Hence, this reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious. *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, 1142 (1983) (defining "abuse of discretion").

*In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 84} We cannot say that the trial court abused its discretion or that the judgments are against the manifest weight of the evidence. The assignments of error are overruled.

## VI.   Conclusion

{¶ 85} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, PRESIDING JUDGE

CORNELIUS J. O'SULLIVAN, JR., J., and
MARY J. BOYLE, J., CONCUR