[Cite as *In re T.C.*, 2024-Ohio-5816.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE T.C., ET AL.                          :

                                 :          Nos. 114036 and 114037

Minor Children                              :

                                 :

[Appeal by Father, J.B.]                    :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 12, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-22-906915 and AD-22-906916

---

### *Appearances:*

Wegman Hessler Valore and Dean M. Valore, *for appellant* J.B.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, for *appellee*.

ANITA LASTER MAYS, J.:

{¶ 1} In these consolidated appeals, appellant J.B. ("Father") contests the juvenile court's termination of Father's parental rights to minor children T.C. (d.o.b. 2/5/2012; Case No. AD-22-906915) and Z.B. (d.o.b. 5/7/2020; Case No. AD-22-906916) (collectively the "children") and the award of permanent custody to the

Cuyahoga County Division of Children and Family Services ("CCDCFS" or the "Agency").[1] After a thorough review of the record and the applicable law, we find no merit to Father's claimed error that the juvenile court's decision was against the manifest weight of the evidence.

## I.    Procedural History

{¶ 2}    On July 12, 2022, the Agency filed a "complaint for abuse (T.C.), neglect, (T.C.), dependency (T.C. and Z.B.), who were 12 years and 3 years of age respectively at the time of trial, and for temporary custody" to the Agency, under R.C. 2151.031(C), 2151.03(A)(3) and 2151.04(D) respectively. The complaint provided in summary:

> The children were previously committed to pre-dispositional temporary custody of the Agency on November 19, 2021 (Case Nos. AD21910432-43), the case was dismissed on July 12, 2022, because the statutory time frame expired, and the children had remained in the Agency's custody throughout that period.  A second complaint was filed on April 12, 2022, was not resolved within the statutory time frame and expired by operation of law on July 11, 2022.
>
> T.C. had various bruises and marks on his face while in the primary care of the parents who denied the injuries existed and failed to explain them. The Agency deemed T.C. and Z.B. to be unsafe in the parents' care.
>
> T.C. was previously adjudicated dependent attributed partly due to unstable housing and a conflicted relationship with Father. (Wayne County Juvenile Court Case No. 2017 JUV-C-000030.
>
> Father exhibited explosive and irrational behavior that he failed to address through anger management. In 2017, Father was convicted of disorderly conduct for damaging property of the Wayne County

[1] The children's mother R.C. ("Mother") has filed a separate appeal in *In re T.C.*, *et al.*, Case No. 113960, assigned as a companion case to the instant appeal. Consequently, this appeal addresses only the termination of Father's parental rights.

Department of Children and Family Services and in 2020 was convicted of disorderly conduct in Medina County Municipal Court.

Father's suicidal and homicidal ideations towards himself, Mother and the children and other mental health issues have not been addressed.

Father's lack of parenting skills rendered him unable to care for the children and interactions with T.C. exacerbated T.C.'s behavior issues. In 2017, the Wayne County Juvenile Court ordered that Father have no contact with T.C. outside of a therapeutic setting.

The parents were unable to address T.C.'s significant behavioral and mental health issues, specifically ODD [oppositional defiant disorder] and ADHD [attention deficit hyperactivity disorder].

Due to the parents' failure to ensure school attendance, T.C. missed a substantial amount of school during the 2021-2022 school year and was unable to participate in Individualized Education program ("I.E.P.") services.

Father failed to address substance abuse issues. He was sentenced to intervention in lieu of conviction in Medina County Common Pleas Court for possession of heroin in 2015, and convicted for possession of marijuana and drug paraphernalia in Parma Municipal Court in 2019.

Father lacked stable, independent housing and could not meet the children's basic needs.

{¶ 3} The Agency stated reasonable efforts were made to prevent removal of the children from the home and that removal was in the best interest of the children.

{¶ 4} Concurrently, the Agency filed a motion for predispositional temporary custody under R.C. 2151.33(B)(1)(a)-(b), Juv.R. 13(B)(2)(a)-(b), and Juv.R. 19. CCDCFS contended there were reasonable grounds to believe the children were in immediate danger due to their surroundings and removal was

necessary to prevent immediate or threatened physical or emotional harm. On July 13, 2022, emergency predispositional temporary custody was granted.

{¶ 5} In February 2023, T.C. was adjudicated, abused, neglected, and dependent while Z.B. was adjudicated dependent. The children were committed to the temporary custody of CCDCFS. The court-approved case plan goal was reunification.

{¶ 6} On April 3, 2023, the Agency filed a motion to modify temporary custody granted under R.C. 2151.353(A) to permanent custody pursuant to R.C. 2151.353(E)(2), 2151.413, and 2151.415(A)(4). The supporting affidavit issued by the worker of record assigned to the case on May 25, 2022, provided the pertinent history of the case, and added as to Father:

> 9. A case plan was filed with [the] Juvenile Court and approved that required that the children's father, [J.B.]: complete a drug and alcohol assessment, participate in and successfully complete any recommended treatment/aftercare, submit to random drug screens as requested, and demonstrate the ability to obtain/maintain long-term sobriety; complete a psychological evaluation, follow all recommendations; successfully complete parenting services; sign releases of information as requested; demonstrate the ability to obtain and maintain appropriate housing and income in which to meet the children's needs.
>
> 10. Despite reasonable case planning and diligent efforts by CCDCFS to assist him in working toward reunification, . . . [Father] has failed consistently and repeatedly to substantially remedy the conditions causing the children to be removed from his care. [Father] has failed to fully engage in case plan services or to demonstrate benefit by reducing the risks associated with the children's removal.
>
> 11. [Father] has demonstrated a lack of commitment to the children by failing to fully engage in services in an attempt to achieve reunification with the children.

12. No relatives have been identified who are both willing and able to provide appropriate care for the children in lieu of an order of permanent custody.

{¶ 7} On September 1, 2023, the court held an in camera meeting with T.C. On September 25, 2023, Mother filed a request to have legal custody awarded to maternal grandfather ("Grandfather").

## II.  Trial

{¶ 8} The trial was held on April 15, 2024.

### A. Agency Service Worker

{¶ 9} Extended services worker  April Palidar ("Palidar") became involved in the matter about six months after the children were brought into Agency care in November 2021 due to T.C.'s excessive school absences and unexplained facial bruises.

{¶ 10} Father's case plan objectives were to address mental health, substance abuse, parenting, and meeting the children's basic needs.  Father's level of progress in the four case plan areas was classified as minimal by Palidar. Father completed the parenting program but did not receive a certificate because he had not been officially referred, possibly due to Agency oversight. Though Father technically completed the classes, Father failed to make the requisite behavioral changes. Supervised visits were difficult because Father was "always very angry" and "would say inappropriate things to" T.C. who was very tense during the visits.

{¶ 11} Father did not comply with referrals for drug and alcohol assessments or random drug testing.  Father told Palidar that "he had previously been in trouble

for drugs and had gone through . . . Drug Court through a different Court and so he felt that that stuff was not necessary and that we were using his past against him."

{¶ 12} Father also exhibited mental health and anger issues, homicidal and suicidal ideations, made racist comments, and engaged in screaming outbursts. Father attended a couple of appointments with Guidestone for a mental health assessment and treatment but did not follow through.

{¶ 13} Father's housing situation was unknown, but Palidar heard that prior to his incarceration he was moving from place to place. Palidar typically attempted to interact with Father after visitation but had not engaged since visitation was stopped in November 2023. Visitation was terminated "because it had just become increasingly unsafe due to dad's behavior and domestic violence between him and mom, and then the last visit [Father]" threw a can of energy drink at Palidar. There were "multiple incidents" where Palidar had to have Father leave the visit "because of his out-of-control behavior, screaming and yelling and name-calling and threats in front of the children." Tr. 41. T.C. informed Palidar that he "hates" his Father, did not want to see him, and did not want to have any contact with him. Palidar also testified to Father's verbal aggression toward Mother and outbursts during court proceedings. She suspected that bruises Mother sometimes exhibited were inflicted by Father though Mother never admitted it.

{¶ 14} Palidar addressed evidence regarding Father's legal issues cited in the Agency's court filings. Father was convicted of felonious assault against Mother in 2023 and was in jail at the time of trial. He was also ordered to address mental

health and substance abuse conditions. In 2017, the Wayne County Juvenile Court ordered that Father was not to have visitation with T.C. unless in a therapeutic setting or due to the court's modification of the order.

{¶ 15} After removal of the children, the Agency became aware of T.C.'s behavioral issues including self-harming behaviors. Initially, T.C. and Z.B. were placed in the same foster home. T.C. "tried to harm himself by wrapping a Slinky [toy] around his neck," "was very physically aggressive towards [Z.B.]" and other children, and threatened to harm the foster parents and others. T.C. was placed with Ohio Guidestone to receive a higher level of care where he remained approximately a year. Negative behaviors included sexualized behaviors. T.C. was diagnosed with post-traumatic stress disorder ("PTSD") and attention deficit hyperactivity disorder ("ADHD"),

{¶ 16} Following his release from Ohio Guidestone, T.C.'s disruptive behavior resulted in removals from several foster homes in a matter of weeks. The first placement caused T.C. to become upset because he was "uncomfortable. . . with a black family." T.C. was removed from the second foster placement for sexualized behavior towards another foster child. The last foster placement was with an adult cousin where T.C. began "having a lot of behavior problems . . . not listening, threatening to kill himself," and was transported and admitted to a hospital psychiatric ward. T.C. was subsequently released to the Cleveland Christian Home where he was residing at the time of trial. T.C. receives individual and group therapy,

attends school on the Cleveland Christian Home grounds, and takes medication. Palidar testified T.C.'s behavior has improved at the home.

{¶ 17} T.C. revealed that he sometimes smoked marijuana with Father but Palidar acknowledged he was not screened for substance abuse. At times, T.C. exhibited unexplained facial bruising but also had a history of self-harming behaviors including head banging. T.C. exhibited suicidal ideations and behavioral issues which escalated during supervised visits with the parents. As of the trial date, a release date from the Cleveland Christian Home had not been set.

{¶ 18} Z.B. has been regularly engaged in services from Guidestone for "a lot of behavioral issues, a lot of aggression . . . hits and punches peers, teachers . . . doesn't sleep well . . . [and] has food issues. Palidar could not say whether Z.B.'s concerns had improved.

{¶ 19} Z.B. appeared to be fearful of T.C. and reportedly did not enjoy visits with him. The Agency had concerns about placing the children together. "[Z.B.] is very young and unable to protect himself and [T.C.] has exhibited some concerning behavioral issues . . . and then [there is] the sexualized behaviors that he has perpetrated on" younger children.

{¶ 20} Supervised two-hour visits with both children and both parents were conducted at Ohio Guidestone, then moved to the Jane Edna Hunter center and subsequently the Cleveland Christian Home. Visits were moved from Ohio Guidestone after T.C. was discharged due to an outburst by Father that caused safety

concerns. The parents rarely missed visits and brought toys, clothing, and gifts for the children.

{¶ 21} When visits were moved to the Jane Edna Hunter Center from Ohio Guidestone, Palidar observed that the "parents were more angry at those visits" and complained about the distance and lack of safety in the neighborhood. When T.C. was relocated to the Cleveland Christian Home, visitations moved there. Visits became progressively worse. Father's outbursts were more frequent, and he had to be removed more often. Father's outbursts appeared to be most wearing on T.C. who would begin swearing and become upset.

{¶ 22} Palidar was aware of Grandfather's application for legal custody but was informed by Grandfather that he preferred to adopt. Grandfather moved to a new apartment to provide suitable housing, was screened and approved by the Agency as a kinship caregiver, and completed the foster parenting licensing application. The day of trial, Palidar was informed Grandfather would accept legal custody. Grandfather visited once or twice until visitation was moved to the Cleveland Christian Home when he began visiting with the children weekly. Grandfather's interaction with the children during visits was good. He played with them and brought them things.

{¶ 23} The Agency requested permanent custody because of Grandfather's interest in legal custody with a concurrent plan of adoption. Parental reunification was no longer an option.

## B. Grandfather

{¶ 24} Grandfather testified that he rented a two-bedroom apartment to provide appropriate housing for the children and has been gainfully employed with a steel company for four years. Grandfather's adult children lived in proximity and would assist with childcare. On cross-examination, Grandfather admitted that one of his adult children had lost custody of her own children.

{¶ 25} Since August 2023, Grandfather has consistently visited with the children for two-hour periods each week. Grandfather requested custody because he did not believe the parents could care for the children. He also expressed frustration that Mother seemed to prioritize her relationship with Father over regaining custody of her children.

{¶ 26} Grandfather testified that he plays games such as chess and checkers with T.C. and talks with him. Regarding T.C.'s behavior issues, Grandfather stated that he is "a typical boy" who is "lacking in some areas[.]" Grandfather said that while T.C. has trouble with school and studying, "he's smart. He's willing to learn. He's well behaved. He listens to me." Grandfather began having unsupervised visits with T.C. — overnight stays on the weekend and would take T.C. fishing and to his race shop where he has antique cars and used to "run" stock cars.

{¶ 27} Grandfather testified that Z.B. was a "typical kid" that sometimes "has a mean streak in him." Grandfather felt that Z.B. was troubled because he does not regularly see his brother. Grandfather disagreed with Palidar and believed the brothers got along well and that Z.B. was often sad to leave his brother. He did not

observe any problems between T.C. and Z.B. and, asked about observations of aggression, responded, "I wouldn't say aggressive. Boys will be boys." "They like to pick on one another. . . . [W]alk by and give you the cold shoulder." He disagreed with Palidar that Z.B. is afraid of T.C. and never observed any sexualized behaviors.

{¶ 28} Grandfather testified that he would be able to handle the children's behavioral issues, T.C.'s healthcare and education needs, and that he would retire early to take care of T.C. and Z.B., if necessary. Grandfather felt that the children had a bond and love each other. When the children are together at Grandfather's home, they play for "three hours straight."

{¶ 29} Grandfather explained during cross-examination that he initially preferred adoption but decided that legal custody would allow him to remove T.C. from the Cleveland Christian Home as soon as possible, due to T.C.'s unhappiness living there and safety concerns resulting from the presence of a woman with a gun in the parking lot of the home a few months earlier. Initially, legal custody would be more expedient than adoption which would allow Grandfather to remove T.C. from the home notwithstanding that T.C. attends school and receives behavioral care there, and the Cleveland Christian Home had not recommended T.C. for discharge at the time of the hearing.

{¶ 30} Grandfather acknowledged that the Agency's substance abuse and domestic violence concerns were valid. Grandfather was unable to say whether Father or Mother had received adequate help and could not testify that the concerns had been abated. Moreover, both Mother and Father owe him "a lot of money."

Informed that the parents would retain residual rights to the children if he acquired legal custody, including the right to visitation, Grandfather responded that he would not have a problem allowing either parent to visit the children.

{¶ 31} Grandfather does not have a good relationship with Father because he has been abusive to Mother and Grandfather is aware that T.C. does not want anything to do with Father. Grandfather would be "willing to give [Father] a second chance to straighten up," if awarded legal custody, despite T.C.'s stated objection to contact with Father. Grandfather believed that he would be able to control Father and protect the children from any outbursts or unwelcome visits to his home.

### C. Children's Guardian Ad Litem

{¶ 32} The guardian ad litem ("GAL") for the children testified that the grant of permanent custody to the Agency was in the children's best interests. The GAL expressed significant concerns about T.C.'s need for stable placement even after placement in Agency custody. The parents were noncompliant with the case plans and previous Wayne County Court orders and have made no observable progress. The GAL also recommended the immediate termination of Father's involvement for the safety of the children. "[F]ather disrespects everyone. That's been his behavior throughout this case. He threatened to kill me. He threatened to kill the social worker. It's routine." Father even "[t]hreatened to kill [Grandfather] who has less to lose, and I am concerned that one or the other of them will be dead," though Grandfather said he would call the police if approached.

{¶ 33} The GAL testified that "I came away from my meeting with [Grandfather feeling] very favorably" but felt that Grandfather "does not know what's going on . . . and he doesn't ask . . . [s]o I don't know how he can promote best interest. Nor do I know how he can keep [Z.B.] safe when [Z.B.]'s 3 [years of age] compared to [T.C.]'s 12 [years of age]."

{¶ 34} The GAL confirmed that hostilities exist between T.C. and Z.B. and does not believe the hostilities should be ignored or deemed to be of no consequence. The GAL cited T.C.'s "homicidal ideations" where T.C. has "actually made plans [to murder Father] and . . . tried to carry them out."

{¶ 35} The GAL stated that T.C. desired to reside with Grandfather and completely cut contact with Father, and Z.B. is too young to express his wishes. However, "placement with [Grandfather] can still be addressed, but Father does not protect and then [Mother] does not do the things that she says or that she should. She chooses Father over the children." Consequently, the GAL opined that it was in the best interest of the children that the trial court award permanent custody to the Agency.

{¶ 36} The GAL was aware that T.C. had been making overnight visits to Grandfather's house though he and Grandfather did not discuss the steps he should take to ensure there was no sexual impropriety between the children. The GAL also expressed serious concerns that due to the likelihood of a confrontation between Father and Grandfather if Grandfather is awarded custody, the court should defer

ruling on the motion for legal custody while the progress of T.C. and Z.B. is monitored and evaluated.

{¶ 37} The GAL acknowledged that he was surprised to hear Grandfather waver on his previously resolute stance that he would not allow the parents to visit the children, but understood Grandfather had been in court waiting all day and could have been tired or uncomfortable. "That's why I am not closing the door to him. The GAL's preference would be that Grandfather adopt so that he's in a very strong position to simply deny visits and he's firmly in control."

### D. Foster Mother

{¶ 38} Z.B.'s current foster mother ("Foster Mother") stated for the record that the children were placed with her in November 2021. T.C. demonstrated "violent behaviors towards my husband, towards myself, towards my biological children, towards [Z.B.] and the other foster children in our home" and was removed in March 2022. Foster Mother requested that Z.B. remain for disability reasons to make sure he was stable.

{¶ 39} Foster Mother observed the love between Grandfather and the children but is concerned that Grandfather will not be able to deal with the children's significant behavioral needs. Grandfather also allowed the children to have video phone calls with Mother, which was not permitted.

{¶ 40} Foster Mother explained that Z.B. "acts out" and has "shown aggression in school." He also throws long tantrums and struggles after visits. Z.B. told Foster Mother he did not want to see T.C. because T.C. hurts him and Foster

Mother fears for Z.B. who will not be able to protect himself. Foster Mother did not think the children should be placed with Grandfather and hoped they could be placed where Grandfather could remain in their lives.

### E. Final Judgment

{¶ 41} On April 30, 2024, the court granted permanent custody of the children to the Agency and terminated the parental rights of Father and Mother, thereby rendering the Grandfather's legal custody motion moot.

## III. Assignment of Error

{¶ 42} Father poses a single assignment of error: the trial court's decision to terminate Father's parental rights and award permanent custody of Z.B. and T.C. to CCDCFS is against the manifest weight of the evidence.

## IV. Discussion

### A. Standard of Review

{¶ 43} An appellate court's standards of review in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and terminate parental rights are "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards" depending on the nature of the arguments presented. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. A manifest weight reviews requires that an appellate court "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest

miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, at ¶ 20.

{¶ 44} "'In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.'" *Id.*, quoting *id.* at ¶ 21. "'"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."'" *Id.*, quoting *id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

## B. Analysis

{¶ 45} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.*, 2020-Ohio-906, ¶ 16. "To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. Second, courts must determine that terminating parental rights and granting permanent custody to CCDCFS is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

### 1. First Prong — R.C. 2151.414(B) Factors

{¶ 46} To terminate parental rights and grant permanent custody to a county agency, the record must demonstrate by clear and convincing evidence the following: (1) the existence of one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) permanent custody is in the best interest of the child under R.C. 2151.414(D). *In re S.H.*, 2012-Ohio-4064, ¶ 27 (8th Dist.).

"Clear and convincing evidence" is that quantum of evidence that instills in the trier of fact a firm belief or conviction as to the allegations sought to be established. *In re Y.V.*, 2011-Ohio-2409, ¶ 13 (8th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 47} "Only one of the four factors must be present for the first prong of the permanent custody analysis to be satisfied. Once the juvenile court ascertains that one of the four factors listed in R.C. 2151.414(B)(1) is present, then the court proceeds to an analysis of the child's best interest" under R.C. 2151.24(D)(1). *In re J.B.*, 2013-Ohio-1705, ¶ 80-81 (8th Dist.).

{¶ 48} The trial court stated it considered R.C. 2151.414(B)(1)(a)-(e) and found by "clear and convincing evidence" that R.C. 2151.414(B)(1)(d) had been satisfied. The statute provides in part that "the child has been in temporary custody of a public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period." The court held that each "child has been in [the] temporary custody of the CCDCFS for more than two years."

{¶ 49} The record confirms by clear and convincing evidence that the children have been in the temporary custody of the Agency since their initial removal on November 21, 2021 (Case Nos. AD21910432-43), the instant cases were refiled on July 12, 2022, and the children have remained in the Agency's custody throughout.

{¶ 50} The first prong has been met.

## 2. Second Prong — R.C. 2151.414(D)(1) Best Interest Factors

{¶ 51} When determining the child's best interest pursuant to R.C. 2151.414(D)(1), courts analyze the following factors, including any other factors the court deems relevant: (1) the interaction and interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and, (5) whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply.[2]

{¶ 52} The "best interest determination" focuses on the child, not the parent. R.C. 2151.414(C); *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist.). The discretion that the juvenile court enjoys in deciding whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned. *Id*. at 316.

{¶ 53} The court stated it considered all of the factors for the children. The court "conducted an in camera interview with T.C. and is aware of his wishes. The child's [GAL] recommended that the child be placed in the permanent custody of the CCDCFS." R.C. 2151.414(D)(1)(b). The GAL for Z.B. "recommended that the child be placed in the permanent custody of the CCDCFS." *Id*.

---

[2] If all of the factors set forth in R.C. 2151.414(D)(2) are met, the grant of permanent custody is mandatory and a weighted analysis under R.C. 2151.414(D)(1) is not required. *In re R.D.*, 2022-Ohio-4519, ¶ 51 (8th Dist.).

{¶ 54} The court also found by clear and convincing evidence under R.C. 2151.414(E) that the children could not be placed with either Mother or Father due to "chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependent of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year." R.C. 2151.414(E)(2). Also, the court found that the parents have demonstrated a lack of commitment by failing to regularly support, visit, or communicate with the children. R.C. 2151.414(E)(4). In addition, the court found that Father "has current legal issues . . . is currently in the Medina County Jail. Mother consistently prioritizes her relationship with [Father] over the best interests and safety of her children." "Father has [a] long history of being explosive and irrational. Mother has been [the] victim of domestic violence from Father but continues to maintain a relationship with him." R.C. 2151.414(E)(16).

{¶ 55} The court concluded by clear and convincing evidence that the award of permanent custody to the Agency was in the best interest of the children. "The children's 'continued residence in or return to the home of [Mother] and [Father] would be contrary to the [children's] best interest.'" "The [children] cannot be placed with a relative because no relative is available, willing, or suitable at this time."

{¶ 56} The court further found that reasonable efforts were made to prevent removal of the children. Father "was referred to substance abuse, mental health and

basic needs." "Father attended the parenting program even though not referred" and "is currently in the Medina County Jail and may be receiving services through the jail." "T.C. is currently placed at Cleveland Christian Home and was referred for individual therapy, group therapy, and medication. The child's sibling, Z.B., was referred for early childhood therapy."

{¶ 57} This court agrees that the record clearly supports the court's findings. The testimony of Palidar, the GAL, and Grandfather confirms the parents' unwillingness to participate in the case plan elements or make efforts toward reunification. Palidar testified that attending the parenting program had no effect on Father's behavior. Father denies he has substance abuse and anger issues and refuses to address them. Father's violent behavior has resulted in multiple legal encounters, ejections from supervised visitation with the children, and threats to Agency workers, family members, and others.

{¶ 58} T.C. had not been discharged by the Cleveland Christian Home at the time of trial, but testimony elicited from Palidar and Grandfather indicates that the therapies he receives there have been beneficial, even if T.C. himself is dissatisfied with the placement. Z.B.'s foster mother testified that Z.B. was making progress in his various therapies, and it is evident that his needs are being met in the foster placement where he has resided most of his life. Both Palidar and the GAL opined that the children should not be placed together because T.C.'s behavioral issues posed safety concerns and Z.B. told Foster Mother that he was afraid of T.C. Grandfather seemed unable to appreciate the severity of the situation and believed

the issues between the children were merely "boys will be boys" behaviors. The GAL recommended that Grandfather's motion for legal custody be considered in the future, but stated that Grandfather was not ready for the responsibility at the time of the hearing. The GAL was also concerned that Grandfather could not protect the children from Father.

{¶ 59} After a thorough review of the record, we find the decision of the trial court to award permanent custody to CCDCFS was not against the manifest weight of the evidence. Therefore, Father's assignment of error is overruled. Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

LISA B. FORBES, P.J., and
EMANUELLA D. GROVES, J., CONCUR